## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, a California public pension fund, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.____02-4086____ |
| JOHN J. RIGAS, TIMOTHY J. RIGAS, JAMES P. RIGAS, MICHAEL J. RIGAS, PETER L. VENETIS, DENNIS P. COYLE, LESLIE J. GELBER,  PETE J. METROS, ERLAND E. KAILBOURNE, JAMES R. BROWN, DELOITTE & TOUCHE, LLP, BANC OF AMERICA SECURITIES, LLC, and SALOMON SMITH BARNEY HOLDINGS, INC. | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Los Angeles County Employees Retirement Association ("Plaintiff" or "LACERA"), by its undersigned counsel, makes this complaint upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon the investigation by its counsel, which has included review and analysis of prospectuses, press releases, loan documents, indentures, news articles, analysts' statements, and publicly filed documents of Adelphia Communications Corporation ("Adelphia" or the "Company") and its subsidiary, Arahova Communications Corp. ("Arahova") (formerly known as Century Communications Corporation), including but not limited to those discussed herein.  LACERA makes the following allegations against John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, Peter L. Venetis, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, Erland E. Kailbourne, James R. Brown, Deloitte & Touche LLP, Banc of America Securities LLC, and

Salomon Smith Barney Holdings Inc. (collectively, "Defendants").  Based on the foregoing,

LACERA believes that substantial, additional evidentiary support exists for the allegations

herein, which LACERA will find after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities action against certain current and former officers and

directors of Adelphia and Arahova (including members of the Rigas family who hold voting

control over Adelphia's common stock), as well as the companies' independent auditor (Deloitte

& Touche LLP) and two of Adelphia's underwriters (Banc of America Securities LLC and

Salomon Smith Barney Holdings Inc.).  Between July 1, 1999 and the present, LACERA and/or

its agents purchased approximately $38 million principal amount of debt securities issued by

Adelphia and Arahova.  These purchases were made based upon financial information which, as

LACERA only learned after-the-fact via a series of Company announcements beginning in late

March 2002, was materially incomplete, false and misleading.

2.     Among other things, the Company revealed for the first time on March 27, 2002,

that billions of dollars in off-balance sheet debt had not been disclosed in its prior SEC filings or

related financial reports.  This debt arose out of borrowings by entities affiliated with the Rigas

family under a series of co-borrowing agreements between those entities and subsidiaries of

Adelphia, which the Company estimated at $2.8 billion in its press release.  During a conference

call later that day, Adelphia revealed that an undisclosed amount of these borrowings had been

used by the Rigas family to purchase Adelphia securities.  Thus, the Rigas family was using

Adelphia's credit to obtain low-interest bank loans, and then purchasing high-interest debt

securities and preferred stock from Adelphia, thereby reaping personal profits from the interest

spread and maintaining control of Adelphia through increased stock ownership, all at the Company's expense.

3.    Adelphia's subsidiaries are jointly and severally liable for the full amount of the Rigas family entities' borrowings under the co-borrowing agreements – which amounted to billions of dollars – but Adelphia's consolidated financial statements and other public statements had failed to disclose either the amount of these liabilities, or the fact that the money was used by the Rigas family.

4.    In early April 2002, Adelphia and Arahova announced that they were delaying the release of their Annual Reports on Form 10-K for the year ended December 31, 2001, so they could "review certain accounting matters relating to co-borrowing credit facilities" which they were parties to.  On April 17, 2002, Adelphia disclosed that the SEC had launched a formal investigation into the co-borrowing agreements.

5.    On May 2, 2002, the Company announced that it expected to restate its previously issued financial statements for 1999 and 2000 and its interim financial statements for 2001, to reflect as additional liabilities the borrowings by Rigas family owned entities under the co-borrowing agreements.  On May 23, 2002, the Company disclosed that "the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion."

6.    In late May 2002, four members of the Rigas family resigned their positions with Adelphia, NASDAQ announced that it was delisting the Company's securities, Adelphia and Arahova defaulted on interest payments on their debt securities, and Adelphia defaulted on

several bank loans.  Arahova and Adelphia filed for bankruptcy protection under Chapter 11 on June 11, 2002, and June 25, 2002, respectively.

7.      As a result of these and other announcements between March 27, 2002 and the filing of this complaint, the trading prices of Adelphia's and Arahova's securities have dropped precipitously.  Adelphia's Class A common stock dropped more than 99%, from $20.39 per share on March 26, to $0.14 per share on June 13.  The price of Adelphia's bonds also dropped materially in response to the adverse news: the Company's 10.875% notes maturing in 2010 fell from a bid of 97 cents on March 27, to 72.5 cents on May 31, and its bond rating declined to BB- on March 28, 2002, to  CCC+ on April 22, 2002, and to C- on May 20, 2002.  The prices and ratings of the other bonds issued by Adelphia and Arahova have similarly dropped in response to the recent disclosures.

8.      In this action, LACERA seeks to recover the losses it has sustained as a result of its purchases of Adelphia and Arahova bonds at artificially inflated prices.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v; Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337; and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

10.      The claims herein arise under Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2); Section 15 of the Securities Act, 15 U.S.C. §77o; Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

4

11.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v; Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b).  Many of the acts alleged herein occurred in substantial part in this District.  In addition, defendants Deloitte & Touche LLP ("Deloitte"), Banc of America Securities LLC ("Banc of America"), and Salomon Smith Barney Holdings Inc. ("Salomon") transacted business and/or maintain offices in this District.

12.    In connection with the acts, conduct, and course of conduct alleged in the Complaint, the defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES AND OTHER RELEVANT ENTITIES

### Adelphia and Arahova

13.    Adelphia, a non-party to this action, is the sixth largest cable company in the United States.  In addition to providing telecommunications services to subscriber customers, Adelphia and its subsidiaries provide management and consulting services to other partnerships, corporations and limited liability companies engaged in the ownership and operation of cable television systems (the "Managed Entities").  John J. Rigas (Adelphia's President, Chairman and CEO) and members of his immediate family, and entities they own or control, have controlling interests in the Managed Entities.  Adelphia is a Delaware corporation with its principal place of business located at One North Main Street, Coudersport, Pennsylvania 16915.  Adelphia filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 25, 2002.

14.     Arahova, a non-party to this action, is engaged in the ownership and operation of cable television systems in California, Colorado, and Puerto Rico.  Arahova has been a wholly owned subsidiary of Adelphia since October 1, 1999, when Adelphia acquired 100% of the common stock of Century Communications Corporation ("Century") in a merger.  As of the same date, Century changed its name to Arahova.  Adelphia assumed the outstanding debt of Century as part of the transaction.  Arahova is a Delaware corporation with its principal place of business located at One North Main Street, Coudersport, Pennsylvania 16915.  Arahova filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 10, 2002.

**Plaintiff**

15.     Plaintiff Los Angeles County Employees Retirement Association ("LACERA") is a California public pension fund providing retirement, disability, and death benefits to eligible Los Angeles County employees and their beneficiaries.  The following debt securities of Adelphia and Arahova were purchased by or on behalf of LACERA:

**Arahova Zero-Coupon Senior Discount Notes Due March 15, 2003**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 2/6/02 | $500,000 | $458,125 |

**Adelphia 9.875% Senior Debentures Due March 1, 2005**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 8/25/99 | $50,000 | $50,531.25 |

6

**Adelphia 9.875% Senior Notes Due March 1, 2007**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 9/27/00 | $300,000 | $284,250 |

**Arahova Senior Discount Notes, Series B, Due January 15, 2008**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 10/14/99 | $1,000,000 | $435,625 |
| W.R. Huff | 10/27/99 | $3,000,000 | $1,314,375 |
| W.R. Huff | 11/2/99 | $2,000,000 | $874,000 |

**Adelphia 8.375% Senior Notes Due February 1, 2008**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| Oaktree Capital Management FX HY | 1/20/00 | $650,000 | $585,406.25 |
| W.R. Huff | 5/25/00 | $1,500,000 | $1,286,250 |

**Adelphia 7.75% Senior Notes Due January 15, 2009**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 8/4/99 | $1,000,000 | $900,000 |
| W.R. Huff | 1/19/00 | $1,000,000 | $866,250 |

**Adelphia 7.875% Senior Notes Due May 1, 2009**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 7/1/99 | $1,500,000 | $1,395,000 |
| W.R. Huff | 7/14/99 | $1,000,000 | $938,750 |
| Western Asset | 11/5/99 | $72,000 | $65,880 |
| Morgan Stanley Acct. #1184 | 2/23/00 | $615,000 | $539,662.50 |
| Morgan Stanley Acct. #1184 | 2/28/00 | $560,000 | $488,600 |
| W.R. Huff | 5/26/00 | $1,900,000 | $1,548,500 |
| W.R. Huff | 8/15/00 | $1,000,000 | $835,000 |

**Adelphia 9.375% Senior Notes Due November 15, 2009**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 11/10/99 | $3,850,000 | $3,819,354 |
| W.R. Huff | 11/10/99 | $2,566,000 | $2,545,574.65 |
| Western Asset | 11/10/99 | $454,000 | $450,366.16 |
| Morgan Stanley Acct. #1184 | 2/16/00 | $505,000 | $485,431.25 |
| Morgan Stanley Acct. #1184 | 2/22/00 | $515,000 | $496,542.40 |
| Morgan Stanley Acct. #1184 | 2/25/00 | $505,000 | $486,378.13 |
| Morgan Stanley Acct. #1184 | 3/22/00 | $420,000 | $402,150 |

**Adelphia 10.875% Senior Notes Due October 1, 2010**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 9/15/00 | $6,000,000 | $5,954,580 |
| W.R. Huff | 9/27/00 | $700,000 | $694,701 |

**Adelphia 10.25% Senior Notes Due June 15, 2011**

| LACERA ACCOUNT | DATE | PRINCIPAL AMOUNT | PURCHASE PRICE |
|---|---|---|---|
| W.R. Huff | 6/7/01 | $2,000,000 | $2,000,000 |
| MW Post Advisory Group LLC | 12/4/01 | $1,500,000 | $1,511,250 |
| MW Post Advisory Group LLC | 5/7/02 | $1,250,000 | $1,162,500 |

**Defendants**

16.    Defendant John J. Rigas founded Adelphia in 1952 and was a director of the Company at all relevant times until his resignation effective May 22, 2002. John Rigas was also Adelphia's President, Chairman, and Chief Executive Officer at all relevant times until May 15, 2002, when he resigned from those positions. John Rigas was also Chairman and a director of Adelphia Business, and President of Adelphia's subsidiaries (including Arahova), at all relevant times. For each of 1998 and 1999, John Rigas received a salary from Adelphia in excess of $1.35 million, and in 1999 he also received Adelphia Business stock options valued at $1.575 million. Pursuant to an agreement with the Company, John Rigas will receive $1.4 million per year in severance payments for the next three years.

9

17.    Defendant Timothy J. Rigas, son of defendant John Rigas, was a director of Adelphia at all relevant times until his resignation effective May 22, 2002. He was also Executive Vice President, Chief Financial Officer, Chief Accounting Officer, and Treasurer of Adelphia until his resignation on May 16, 2002. Timothy Rigas was a director, Vice Chairman, Chief Financial Officer, and Treasurer of Adelphia Business, as well as Executive Vice President, Chief Financial Officer, Chief Accounting Officer, and Treasurer of Adelphia's subsidiaries (including Arahova), at all relevant times. Timothy Rigas was a member of Adelphia's Audit Committee until June 13, 2001.

18.    Defendant James P. Rigas, son of defendant John Rigas, was a director of Adelphia and Adelphia Business, as well as Executive Vice President of Strategic Planning of Adelphia, at all relevant times until his resignation from those positions effective May 22, 2002. James Rigas was also Vice Chairman, President, Chief Executive Officer and Chief Operating Officer of Adelphia Business, and Vice President of Adelphia's subsidiaries (including Arahova), at all relevant times.

19.    Defendant Michael J. Rigas, son of defendant John Rigas, was a director of Adelphia and Adelphia Business, as well as Executive Vice President of Operations and Secretary of Adelphia, at all relevant times until his resignation from those positions effective May 22, 2002. Michael Rigas was also Vice Chairman, Secretary, and a director of Adelphia Business, and Vice President of Adelphia's subsidiaries (including Arahova), at all relevant times.

20.    Together, defendants John Rigas, Timothy Rigas, Michael Rigas, and James Rigas, (collectively, the "Rigas Parties") effectively own a 22% economic interest in Adelphia

and an estimated 91% of Adelphia's voting control, through ownership of Adelphia's Class A and supervoting Class B common stock. The Class B common stock is entitled to ten votes per share and is 100% owned by the Rigas family. Until their resignations, the Rigas Parties were the Company's four highest paid officers. Further, the Rigas Parties own a majority of Adelphia Business.

21.     Defendant Peter L. Venetis ("Venetis") is the son-in-law of John Rigas, by virtue of his marriage to John Rigas's daughter, Ellen Rigas Venetis. Venetis was a director of Adelphia from 1999 until June 11, 2002. He is also a director of Adelphia Business and the Managing Partner of Praxis Capital Ventures, L.P., a subsidiary of Adelphia. Venetis was employed by Salomon Brothers, Inc. from 1985 to 1992, where he rose to the level of a Director in the Leveraged Finance Group. He was President and Chief Executive Officer of the Atlantic Bank of New York from March 1992 to April 2000. On or about May 22, 2002, the Company's Board of Directors and the Special Committee passed resolutions calling for Venetis's resignation as a director of Adelphia. He resigned several weeks later, on June 11, 2002.

22.     Defendant Dennis P. Coyle ("Coyle") has been a director of Adelphia since 1995. Coyle is also General Counsel and Secretary of FPL Group, Inc. and Florida Power & Light Company. Coyle was a member of Adelphia's Compensation Committee at all relevant times, and has been a member of Adelphia's Audit Committee since April 1, 2001.

23.     Defendant Leslie J. Gelber ("Gelber") has been a director of Adelphia since 1999. Gelber has also been President and Chief Operating Officer of Caithness Corporation since January 1999. From 1993 until July 1998, Gelber was President of ESI Energy, Inc., a subsidiary

of FPL Group, Inc.   Gelber was a member of Adelphia's Compensation Committee at all relevant times.

24.    Defendant Erland E. Kailbourne ("Kailbourne") has been a director of Adelphia since 1999.  Upon the resignation of John Rigas, Kailbourne became the Chairman and Interim Chief Executive Officer of Adelphia.  Kailbourne is the retired Chairman and Chief Executive Officer (New York Region) of Fleet National Bank.  He served with the Fleet organization or its predecessors for 37 years prior to his retirement on January 31, 1998.  Among other organizations, he is a member of the Advisory Council of the New York State Banking Board.  Kailbourne was a member of Adelphia's Compensation Committee at all relevant times, and has been a member of Adelphia's Audit Committee since April 1, 2001.

25.    Defendant Pete J. Metros ("Metros") has been a director of Adelphia since 1986.  He is also a director of Adelphia Business.  Metros was a member of Adelphia's Audit Committee and Compensation Committee at all relevant times.

26.    Defendant James R. Brown ("Brown") was an eighteen year veteran of Adelphia and its Vice President of Finance until his resignation on May 19, 2002.  Brown signed certain of the co-borrowing agreements on behalf of Adelphia subsidiaries.

27.    Defendant Deloitte & Touche, LLP ("Deloitte") is an accounting firm that at all relevant times provided accounting services to Adelphia and Arahova.  Deloitte audited Adelphia's annual financial statements for each of the years 1994 through 2000.   Deloitte audited Arahova's annual financial statements for each of the years 1995 through 2000.  These annual financial statements were incorporated into and made a part of Adelphia's and Arahova's prospectuses and other public filings with the knowledge and express consent of Deloitte.

Deloitte was also engaged to conduct the audits of Adelphia's and Arahova's year 2001 annual financial statements, but its work on those audits has been suspended pending completion of their internal investigations into the co-borrowing agreements and related matters.

28.    Defendant Banc of America Securities, LLC ("Banc of America") was a joint book-running manager and underwriter with respect to certain of the bond issuances that are the subject of this suit. Banc of America or its affiliates were also lead arrangers and/or lenders on a number of the Company's and its subsidiaries' credit facilities, including four co-borrowing agreements pursuant to which Rigas family entities obtained billions of dollars in loans that were guaranteed by Adelphia's subsidiaries but not disclosed to the public. Since at least January 2001, Banc of America has also been engaged by the Company to manage certain of the Company's disposition activities and to advise the Company on capital funding matters.

29.    Defendant Salomon Smith Barney Holdings, Inc. ("Salomon") was a joint book-running manager and underwriter with respect to certain of the bond issuances that are the subject of this suit. Salomon or its affiliates were lenders and/or managing agent on three co-borrowing agreements between the Company's subsidiaries and Rigas family-controlled entities. Since at least January 2001, Salomon has also been engaged by the Company to manage certain of the Company's disposition activities and to advise the Company on capital funding matters.

**The Managed Entities**

30.    Highland Prestige Georgia, Inc. ("HPGI"), a Delaware corporation, is the parent company of a number of entities that own or operate cable systems, including Prestige Communications, Inc., Highland Carlsbad Cablevision, Inc., Highland Carlsbad Operating Subsidiary, Inc., Desert Hot Springs Cablevision, Inc., and Cablevision Business Services, Inc.

13

These subsidiaries, together with HPGI, are collectively referred to herein as the "Highland Prestige Entities." The Rigas Parties and Ellen Rigas Venetis own all of the equity interests in HPGI.

31.    Highland Holdings is a Pennsylvania general partnership, of which the Rigas Parties and Ellen Rigas Venetis are the general partners.

32.    Highland Video Associates, L.P. ("HVA") is a Pennsylvania limited partnership whose partnership interests are all owned, directly or indirectly through Highland Holdings, by the Rigas Parties and Ellen Rigas Venetis. HVA owns substantially all of the partnership interests in a number of entities that own or operate cable systems, including Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision of West Palm Beach II, LLC, Montgomer Cablevision Associates, L.P., Adelphia Cablevision Broadcasting Corporation, and Henderson Community Antenna Television, Inc. Together with HVA, these entities are collectively referred to herein as the "HVA Entities."

33.    Hilton Head Communications, L.P., Doris Holdings, L.P., NCAA Holdings, Inc., Illiad Holdings, Inc., and Ionian Communications, L.P. (collectively referred to as the "HHC Entities") are entities that operate cable systems and are owned directly or indirectly by the Rigas Parties and Ellen Rigas Venetis.

34.    Coudersport Television Cable Company ("CTCC"), a Pennsylvania corporation, is an operating cable company which is 100% owned by John Rigas.

35.    Niagara Frontier Hockey, L.P. ("NFHLP") is a limited partnership in which John Rigas holds a 99% limited partner interest. Patmos, Inc., a corporation 100% owned by the Rigas

Parties, holds a 1% general partner interest in NFHLP.  NFHLP owns the National Hockey

League franchise for the Buffalo Sabres.

36.     The Highland Prestige Entities, Highland Holdings, the HVA Entities, the HHC

Entities, CTCC, and NFHLP are collectively referred to herein as the Managed Entities.

**Other Rigas Family-Controlled Entities**

37.     Coudersport Theatre is a sole proprietorship which is 100% owned by John Rigas.

38.     Dorellenic Cable Partners ("Dorellenic") is a Pennsylvania general partnership, of

which the Rigas Parties and Ellen Rigas Venetis are the general partners.

39.     Eleni Interiors, Inc. ("EI"), a New York corporation, is an interior design firm

which is 100% owned by John Rigas.

40.     ErgoArts, Inc. ("ErgoArts"), a film development company, is 100% owned by

John Rigas and Ellen Rigas Venetis.

41.     Songcatcher Films, LLC ("Songcatcher") is a developer and provider of films.

John Rigas and Ellen Rigas Venetis own equity interests in Songcatcher.

42.     Dobaire Designs ("Dobaire") is a design services firm which is wholly owned by

Doris Rigas, the wife of John Rigas and the mother of Michael Rigas, Timothy Rigas, James

Rigas, and Ellen Rigas Venetis.

43.     Highland 2000, L.P. ("Highland 2000") is a Delaware limited partnership, of

which the Rigas Parties and Ellen Rigas Venetis are the limited partners.  The Rigas Parties own

the general partner of Highland 2000.

44.     Wending Creek Farms, Inc. ("Wending Creek"), a Pennsylvania corporation, is a

provider of facilities maintenance services and related materials, including snow removal, lawn

care, landscaping, minor construction, electrical, heating, ventilation and air conditioning services.  It is 100% owned by John Rigas.

45.     Wending Creek 3656, LLC ("Wending 3656") is an entity that owns certain real property near Coudersport, Pennsylvania.  Wending 3656 is owned by the Rigas Parties and Ellen Rigas Venetis.

## THE BONDS

46.     LACERA's claims arise out of its purchases of the following debt securities: Arahova Zero-Coupon Senior Discount Notes due March 15, 2003 (the "2003 Bonds"); Adelphia 9.875% Senior Debentures Due March 1, 2005 (the "2005 Bonds"); Adelphia 9.875% Senior Notes Due March 1, 2007 (the "March 2007 Bonds"); Arahova Senior Discount Notes, Series B, due January 15, 2008 (the "January 2008 Bonds"); Adelphia 8.375% Senior Notes Due February 1, 2008 (the "February 2008 Bonds"); Adelphia 7.75% Senior Notes Due January 15, 2009 (the "January 2009 Bonds"); Adelphia 7.875% Senior Notes due May 1, 2009 (the "May 2009 Bonds"); Adelphia 9.375% Senior Notes Due November 15, 2009 (the "November 2009 Bonds"); Adelphia 10.875% Senior Notes due October 1, 2010 (the "2010 Bonds"); and Adelphia 10.25% Senior Notes due June 15, 2011 (the "2011 Bonds") (collectively, the "Bonds").

47.     The 2003 Bonds were issued by Arahova (then known as Century) in 1993. LACERA and/or its agents purchased 2003 Bonds in the secondary market in February 2002.

48.     The 2005 Bonds were issued by Adelphia in 1995.  LACERA and/or its agents purchased 2005 Bonds in the secondary market in August 1999.

49.    The 2007 Bonds were issued by Adelphia in 1997.  LACERA and/or its agents purchased 2007 Bonds in the secondary market in September 2000.

50.    The January 2008 Bonds were issued by Arahova (then known as Century) in 1998.  LACERA and/or its agents purchased January 2008 Bonds in the secondary market in October and November 1999.

51.    The February 2008 Bonds were issued by Adelphia in 1998.  LACERA and/or its agents purchased February 2008 Bonds in the secondary market in January and May 2000.

52.    The January 2009 Bonds were issued by Adelphia in January 1999.  LACERA and/or its agents purchased January 2009 bonds in the secondary market in August 1999 and January 2000.

53.     The May 2009 Bonds were issued by Adelphia in April 1999.  LACERA and/or its agents purchased May 2009 Bonds in the secondary market between July 1999 and August 2000.

54.    The November 2009 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated November 10, 1999 and filed with the SEC as of November 12, 1999 (the "November 2009 Prospectus").  The November 2009 Prospectus constituted part of a Registration Statement on Form S-3, which was initially filed with the SEC as a shelf registration statement on May 7, 1999.  Salomon was a joint book-running manager and underwriter for the public offering of the November 2009 Bonds.  LACERA and/or its agents purchased November 2009 Bonds in the initial offering and in the secondary market.

55.    The 2010 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated September 15, 2000 and filed with the SEC as of September 18, 2000 (the "2010

Prospectus"). The 2010 Prospectus constituted part of a Registration Statement on Form S-3, which was initially filed with the SEC as a shelf registration statement on May 7, 1999. Salomon and Banc of America were joint book-running managers and underwriters for the public offering of the 2010 Bonds. LACERA and/or its agents purchased 2010 Bonds in the initial offering and in the secondary market.

56.    The 2011 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated June 7, 2001 and filed with the SEC as of June 8, 2001 (the "2011 Prospectus"). The 2011 Prospectus constituted part of a Registration Statement on Form S-3, which was initially filed with the SEC as a shelf registration statement on May 7, 1999. Banc of America and Salomon were joint book-running managers as well as lead underwriters for the public offering of the 2011 Bonds. LACERA and/or its agents purchased 2011 Bonds in the initial offering and in the secondary market.

57.    The November 2009 Prospectus, the 2010 Prospectus, and the 2011 Prospectus (collectively, the "Prospectuses") each incorporated by reference financial statements of Adelphia and/or Arahova that were audited by Deloitte. With Deloitte's knowledge and consent, its audit reports on those financial statements were also incorporated by reference in the Prospectuses.

58.    Salomon prepared, or substantially participated in the preparation of, the Prospectuses.

59.    Banc of America prepared, or substantially participated in the preparation of, the 2010 Prospectus and the 2011 Prospectus.

## CONTENTS OF THE PROSPECTUSES AND OTHER
## PUBLIC STATEMENTS BY DEFENDANTS PRIOR TO MARCH 27, 2002

60.     On June 19, 1996, Adelphia issued a press release announcing that one of its

subsidiaries, Global Acquisition Partners, L.P., had become a party to a credit agreement dated

March 29, 1996, which provided for loans of up to $200 million.  HVA was a co-borrower under

the agreement.

61.     On May 7, 1999, Adelphia filed a registration statement on Form S-3 (the

"Registration Statement") with respect to debt securities, preferred stock, and common stock in

an aggregate amount of up to $4,601,880,000.  The Registration Statement constituted a shelf

registration statement, providing for the offering of securities on a delayed or continuous basis

pursuant to Rule 415 under the Securities Act.  Attached to the Registration Statement was a

preliminary prospectus.  The preliminary prospectus described the general terms and provisions

of the securities, and stated:  "We will describe the particular terms and provisions of the series

of debt securities offered by a prospectus supplement, and the extent to which such general terms

and provisions ... may apply thereto, in the prospectus supplement relating to such series of debt

securities."  The Registration Statement was signed by defendants John Rigas, Michael Rigas,

Timothy Rigas, James Rigas, Pete Metros, and Dennis Coyle.

62.     On August 16, 1999, Adelphia issued a press release in which John Rigas

announced the Company's financial results for the second quarter of 1999.  On a consolidated

basis, the Company reported record quarterly revenue of $226.3 million, and total debt of

$3,794,539,000 as of June 30, 1999.  The press release also stated that the Company had

4,890,650 basic subscribers (on a pro forma basis, giving effect to all announced transactions).

John Rigas was quoted as saying, among other things:  "The combined entities added 37,000

basic subscribers, which was ahead of our expectations and also reported revenue and EBITDA growth rates of 9% which were in line with our expectations. Additionally, the companies investment in plant rebuilds and new product rollouts gained momentum with capital spending increasing 30% compared to the March 1999 quarter."

63.    Also on August 16, 1999, the Company filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended June 30, 1999, including the same revenue, debt, and subscriber base figures that were set forth in its press release of August 16, 1999. The Form 10-Q also stated that the Company's total debt of $3,794,539,000 included approximately $2.4 billion of parent debt and approximately $1.4 billion of subsidiary debt. These figures did not include the Managed Entities' borrowings under the March 1996 co-borrowing agreement, for which Adelphia's subsidiaries were jointly and severally liable. The Form 10-Q was signed by Timothy Rigas.

64.    On September 17, 1999, Adelphia filed a Form 8-K with the SEC, announcing that "subsidiaries of Adelphia and Olympus and their affiliates" had entered into a credit agreement on May 6, 1999. Salomon was one of the lenders under this credit agreement. The credit agreement was signed by defendant Brown on behalf of Adelphia's subsidiaries. HHC, one of the Managed Entities, was also a borrower under the agreement. The Form 8-K was signed by Timothy Rigas.

65.    On October 1, 1999, Adelphia acquired 100% of the common stock of Century, and Century changed its name to Arahova. Adelphia announced the consummation of the merger in a Form 8-K filed with the SEC on October 14, 1999.

66. On November 15, 1999, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 1999. On a consolidated basis, the Company reported record quarterly revenue of $242.3 million, quarterly EBITDA of $85,394,000, and total debt of $3,968,180,000 as of September 30, 1999. The press release also stated that "[d]uring the last twelve months basic cable subscribers grew 1.9% to 4,986,390." John Rigas was quoted as saying, among other things: "[W]e are pleased to report that the combined cable operations have continued to achieve impressive results during this busy period. [Adelphia Business] made tremendous strides during the quarter and has become an increasingly important component of revenue and EBITDA growth for Adelphia."

67. Also on November 15, 1999, the Company filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended September 30, 1999, including the same revenue, debt, and subscriber base figures as were stated in the November 15, 1999 press release. The Company reported that its total consolidated debt of $3,968,180,000 included approximately $2.4 billion of parent debt and approximately $1.56 billion of subsidiary debt. These figures did not include the Managed Entities' borrowings under the March 1996 or May 1999 co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable. The Form 10-Q was signed by Timothy Rigas.

68. On November 12, 1999, Adelphia filed the November 2009 Prospectus with the SEC with respect to the issuance of $500 million aggregate principle amount of November 2009 Bonds. In this prospectus, Adelphia stated that the net proceeds of the offering were expected to be about $495.5 million, a portion of which would be used to redeem senior debentures of the Company, with the remainder to be contributed to Adelphia subsidiaries and used to repay

borrowings under revolving credit facilities of those subsidiaries. Adelphia stated in the prospectus that, as of June 30, 1999, it had approximately 5 million basic subscribers and approximately $3.8 billion in long-term debt, consisting of approximately $2.4 billion of Adelphia debt and approximately $1.4 billion of subsidiary debt. These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable. The November 2009 Prospectus described several covenants that would be set forth in the indenture, including: (a) a requirement that the consolidated indebtedness of Adelphia and its subsidiaries not exceed 8.75 times the annualized pro form EBITDA for the latest fiscal quarter for which financial statements are available; (b) a prohibition on transactions between Adelphia (or its subsidiaries) and any affiliates (including the Managed Entities) on terms that are less favorable than what could be obtained in an arm's length transaction; and (c) a prohibition on transactions between Adelphia (or its subsidiaries) and any affiliates (including the Managed Entities) that involve more than $1 million and are not approved by the independent members of Adelphia's Board, except for dividends, redemption or repurchase of notes or common stock, or Board-approved payments of compensation for the personal services of officers, directors, or employees of Adelphia or its subsidiaries. The November 2009 Prospectus incorporated by reference, among other documents, Adelphia's Form 10-Q filing for the period ended June 30, 1999. The November 2009 Prospectus failed to disclose material information, including the off-balance sheet debt for which the Company was responsible under the co-borrowing agreements. Salomon was a joint book-running manager and lead underwriter for the offering.

22

69.     On March 30, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the fourth quarter of 1999.  On a consolidated basis, the Company reported record quarterly revenue of $635.3 million, quarterly EBITDA of $267.7 million, and total debt of $9,291,732,000 as of December 31, 1999.  The Company reported that its pro forma revenue and EBITDA had increased 10.4% and 11.4%, respectively, since the fourth quarter of 1998.  The press release also stated that, "[o]n a pro forma basis, as if all acquisitions and divestitures had occurred on January 1, 1998, basic cable subscribers grew 1.7% to 4,990,092 during the year ended December 31, 1999."

70.     Also on March 30, 2000, Adelphia filed its Form 10-K with the SEC for the year ended December 31, 1999.  The Form 10-K included annual financial statements which had been audited by Deloitte, and reported the same revenue, debt, and subscriber base figures that were reported in the March 30, 2000 press release.  The financial statements included a balance sheet indicating that the total debt of Adelphia and its subsidiaries as of December 31, 1999 was $9,291,732,000 (consisting of approximately $2.8 billion of parent debt and approximately $6.5 billion of subsidiary debt), and that total stockholders' equity was approximately $3.7 billion.  The filing indicated that $3,088,477,000 of Adelphia's subsidiaries' debt was owed to banks and financial institutions.  The Form 10-K stated that certain subsidiaries of Adelphia were co-borrowers with Managed Entities under credit facilities for borrowings of up to $1.025 billion, and that each co-borrower was liable for all borrowings under the credit agreements (except that the lenders had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries), but the full amount of the outstanding borrowings under these co-borrowing agreements was not disclosed.  In fact at least $700 million of Managed Entities' borrowings, for

which Adelphia's subsidiaries were liable, was omitted from Adelphia's consolidated balance sheet as of December 31, 1999. The Form 10-K also stated that entities controlled by the Rigas family had purchased 4 million shares of the Company's Class A common stock for cash in 1999, and that Highland Holdings (a Rigas family entity) had entered into agreements during the year to purchase $512.5 million of Class B common stock, of which $375 million were purchased on January 21, 2000. The remaining $137.5 million was sold on July 3, 2000. The source of the funds for these purchases was not disclosed. The Form 10-K was signed by defendants John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Venetis, Coyle, Metros, Gelber, and Kailbourne.

71.    Adelphia's Form 10-K for the year ended December 31, 1999, contained an Independent Auditors' Report by Deloitte. In that report, Deloitte stated that it had audited the consolidated balance sheets and related financial statements of Adelphia and its subsidiaries as of December 31, 1998 and 1999, and that it had conducted its audits in accordance with generally accepted auditing standards ("GAAS"). Deloitte reported that it believed its audits provided a reasonable basis for its opinion that the financial statements "present fairly, in all material respects, the financial position of Adelphia ... and subsidiaries at December 31, 1998 and 1999 ... in conformity with generally accepted accounting principles," and that the "financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects the information set forth therein."

72.    On May 1, 2000, the Company filed an amendment to its Form 10-K filing for the year ended December 31, 1999. The amendment disclosed the existence of certain co-borrowing

agreements, including the March 29, 1996 agreement and the May 6, 1999 agreement.  The amounts outstanding under those agreements still were not disclosed.

73.    On May 15, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the first quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $672.7 million and quarterly EBITDA of $262.3 million.  The press release also stated that the Company had 5,003,517 basic subscribers.  John Rigas was quoted as saying that this figure represented 3% annualized basic subscriber growth.

74.    Also on May 15, 2000, the Company filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended March 31, 2000, including the revenue figures set forth in its May 15, 2000 press release.  The Company reported total consolidated debt of $9,384,508,000 as of March 31, 2000, which included approximately $2.8 billion of parent debt and approximately $6.6 billion of subsidiary debt.  The Form 10-Q also reported that on April 14, 2000, "certain subsidiaries and affiliates of Adelphia" had closed on a $2,250,000 bank credit facility, consisting of a $1,500,000 8-3/4 year reducing revolving credit loan and a $750,000 9 year term loan.  However, the debt figures reported in the Form 10-Q did not include the Managed Entities' borrowings under that co-borrowing agreement or the earlier co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

75.    On August 11, 2000, Arahova filed a Form 10-K for the transition period from June 1, 1999 to December 31, 1999.  The Form 10-K disclosed that a subsidiary of Arahova was a party to the April 14, 2000 credit facility entered into by other subsidiaries and affiliates of Adelphia, but did not disclose any liabilities of Arahova or its subsidiary for the borrowings of

Managed Entities under that agreement. This Form 10-K was signed by John Rigas, Timothy Rigas, Michael Rigas, and James Rigas.

76.    On August 14, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the second quarter of 2000. On a consolidated basis, the Company reported record quarterly revenue of $704.1 million and quarterly EBITDA of $273.2 million. The press release also stated that the Company had 5,145,917 basic subscribers. Timothy Rigas was quoted as saying, among other things: "We were pleased with our overall financial results during the second quarter especially with our pro forma consolidated revenue growth of 16.5%, which we believe places us among the leaders in our industry.... In the increasingly competitive video market we continue to have success, as demonstrated by our continued growth in basic cable subscribers during the second quarter."

77.    Also on August 14, 2000, Adelphia filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended June 30, 2000, including the revenue figures set forth in its August 14, 2000 press release. The Company reported total consolidated debt of $9,978,775,000 as of June 30, 2000, which included approximately $2.8 billion of parent debt and approximately $7.2 billion of subsidiary debt. These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable. The Form 10-Q was signed by Timothy Rigas.

78.    Also on August 14, 2000, Arahova filed its Form 10-Q for the quarter ended June 30, 2000. It reported total debt on a consolidated basis of $3,556,682,000 as of June 30, 2000. This figure did not include the Managed Entities' borrowings under the April 14, 2000 co-

borrowing agreement, for which a subsidiary of Arahova was jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

79.    On September 13, 2000, Adelphia issued a press release announcing that it had received commitments for a new $500 million bank term loan, which would "form an additional tranche of an existing $2.25 billion credit facility closed in April 2000 by subsidiaries and affiliates of Adelphia."  This press release was attached as an exhibit to a Form 8-K signed by Timothy Rigas and filed with the SEC on September 14, 2000.  According to the Company's Form 10-K for the year 2000, Adelphia closed on this loan, "through certain subsidiaries and affiliates," on September 28, 2000.

80.    Also on September 13, 2000, Adelphia issued a press release announcing a proposed offering of $500 million principal amount of the 2010 Bonds.

81.    On September 15, 2000, Adelphia issued a press release announcing that it had sold $750 million aggregate principal amount of 2010 Bonds, that it planned to use the net proceeds to repay existing indebtedness of its subsidiaries, and that the transaction (which had increased from its previously-announced size of $500 million) was expected to close on September 20, 2000.  The press release invited investors to contact Banc of America or Salomon to obtain a prospectus.

82.    On September 18, 2000, Adelphia filed the 2010 Prospectus with the SEC with respect to the issuance of $750 million aggregate principle amount of 2010 Bonds.  The prospectus stated that the net proceeds of the offering were estimated at $732.5 million, which would be contributed to Adelphia subsidiaries to repay borrowings under their revolving credit facilities.  According to the prospectus, as of June 30, 2000, the Company had approximately 5.6

27

million basic subscribers and approximately $10 billion in long-term debt, consisting of $2.8 billion of parent company debt, approximately $1.9 billion of Arahova public debt, and approximately $5.3 billion of other subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The prospectus described several covenants that would be set forth in the indenture, including those described above that were set forth in the November 2009 Prospectus.  The 2010 Prospectus incorporated by reference, among other documents, Adelphia's Form 10-K for the year ended December 31, 1999 (as amended) and Adelphia's Form 10-Qs for the periods ended March 31, 2000 and June 30, 2000.  The 2010 Prospectus failed to disclose material information, including the off-balance sheet debt for which the Company was responsible under the co-borrowing agreements.  Banc of America and Salomon were joint book-running managers on the offering, as well as underwriters.

83.     On November 14, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $727.9 million and quarterly EBITDA of $280.3 million.  The press release also stated that the Company had 5,543,067 basic cable subscribers.  Timothy Rigas was quoted as saying, among other things:  "The third quarter demonstrated continued success in both our cable and telephone subsidiaries.  The combined financial results of our cable operations and [Adelphia Business's] original markets, were impressive.  Together these operations delivered pro forma revenue and EBITDA growth of 12.1% and 13.0%, respectively."

28

84.     Also on November 14, 2000, Adelphia filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended September 30, 2000, including the revenue figures set forth in its November 14, 2000 press release.  Adelphia reported total consolidated debt of $11,005,411,000 as of September 30, 2000, which included approximately $3.42 billion of parent debt and approximately $7.58 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

85.     Also on November 14, 2000, Arahova filed its Form 10-Q for the quarter ended September 30, 2000.  It reported total debt on a consolidated basis of $3,219,372,000 as of September 30, 2000.  This figure did not include the Managed Entities' borrowings under the April 14, 2000 and September 28, 2000 co-borrowing agreements, for which a subsidiary of Arahova was jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

86.     On December 18, 2000, Adelphia filed amendments to its Form 10-K for the year ended December 31, 1999 and its Form 10-Qs for the quarterly periods ended March 31, 2000, June 30, 2000, and September 30, 2000, which contained restated financial statements for those periods reflecting a revision in the Company's accounting treatment for an April 1998 swap of cable systems.  These restatements did not correct any of the misstatements or omissions in the Company's prior financial statements relating to its revenues, subscriber numbers, debt levels, or its liabilities under the co-borrowing agreements.

87.     On January 3, 2001, Adelphia issued a press release announcing that it had closed a new $1.3 billion subsidiary short term credit facility led by Banc of America and

Citibank/Salomon Smith Barney.  The Company stated that approximately $360 million of the facility would be used to repay another subsidiary credit facility, while the remaining proceeds would be used for general corporate purposes including the repayment of revolving debt.

88.     On April 2, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the fourth quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $804.6 million and quarterly EBITDA of $275.9 million.  The press release also stated that the Company had 5,547,690 basic cable subscribers. Timothy Rigas was quoted as saying, among other things:  "The year 2000 demonstrated continued success in both our cable and telephone subsidiaries.  The combined financial results of our cable operations and [Adelphia Business's] original markets were impressive.  Together these operations delivered pro forma revenue and EBITDA growth of 12.5% and 13.9%, respectively."  Timothy Rigas further stated that the Company expected revenue and EBITDA growth in the range of 11% to 12.5% for the full year 2001.

89.     Also on April 2, 2001, Adelphia filed its Form 10-K with the SEC for the year ended December 31, 2000.  The Form 10-K included annual financial statements which had been audited by Deloitte, and reported the same revenue and subscriber base figures that were reported in the April 2, 2001 press release.  The financial statements included a balance sheet indicating that the total debt of Adelphia and its subsidiaries as of December 31, 1999 was $12,603,413,000 (consisting of approximately $3.4 billion of parent debt and approximately $9.2 billion of subsidiary debt), and that stockholders' equity was $4,150,279,000 as of that date.  The filing indicated that $5,708,529,000 of Adelphia's subsidiaries' debt was owed to banks and financial institutions.  The Form 10-K stated that certain subsidiaries of Adelphia were co-borrowers with

Managed Entities under credit facilities for borrowings of up to $3,751,250,000, and that each

co-borrower was liable for all borrowings under the credit agreements (except that the lenders

had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries), but

the full amount of the outstanding borrowings under these co-borrowing agreements was not

disclosed.  In fact at least $1.2 billion of Managed Entities' borrowings, for which Adelphia's

subsidiaries were jointly and severally liable, were omitted from Adelphia's consolidated balance

sheet as of December 31, 2000.  The Form 10-K also indicated that Highland 2000 had

purchased 8,401,522 shares of Adelphia Class B common stock in 2000.  The source of the funds

used to make these purchases was not disclosed.  The Form 10-K was signed by defendants John

Rigas, Timothy Rigas, Michael Rigas, James Rigas, Venetis, Coyle, Metros, Gelber, and

Kailbourne.

90.     Adelphia's Form 10-K for the year ended December 31, 2000, contained an

Independent Auditors' Report by Deloitte.  In that report, Deloitte stated that it had audited the

consolidated balance sheets and related financial statements of Adelphia and its subsidiaries as of

December 31, 1999 and 2000, and that it had conducted its audits in accordance with GAAS.

Deloitte reported that it believed its audits provided a reasonable basis for its opinion that the

financial statements "present fairly, in all material respects, the financial position of Adelphia ...

and subsidiaries at December 31, 1999 and 2000 ... in conformity with accounting principles

generally accepted in the United States of America," and that the "financial statement schedules,

when considered in relation to the basic consolidated financial statements taken as a whole,

present fairly, in all material respects the information set forth therein."

31

91.     Also on April 2, 2001, Arahova filed its Form 10-K for the year ended December 31, 2000.  It reported total debt on a consolidated basis of $4,313,825,000 as of December 31, 2000.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which a subsidiary of Arahova was jointly and severally liable.  The Form 10-K was signed by Timothy Rigas, John Rigas, Michael Rigas, and James Rigas, and contained an Independent Auditors Report by Deloitte which stated that Deloitte had conducted its audit in accordance with GAAS and that, in their opinion, Arahova's financial statements "present fairly, in all material respects, the financial position of Arahova ... and subsidiaries at December 31, 1999 and 2000 ... in conformity with accounting principles generally accepted in the United States of America," and that the "financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein."

92.     On April 20, 2001, the Company issued a press release and filed a Form 8-K (signed by Timothy Rigas) announcing the final terms for a public offering of $500 million aggregate principal amount of 3.25% convertible subordinated notes due 2021.  These documents also disclosed that the Rigas family had entered into an agreement with Adelphia to purchase $400 million aggregate principal amount of similar notes, which would be convertible to Class B common stock.

93.     On May 15, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the first quarter of 2001.  On a consolidated basis, the Company reported record quarterly revenue of $838.2 million and quarterly EBITDA of $315.6 million.  The press release also stated that the Company had 5,723,315 basic cable subscribers.

32

94.    Also on May 15, 2001, Adelphia filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended March 31, 2001, including the revenue and basic subscriber numbers set forth in its May 15, 2001 press release.  The Company reported total debt on a consolidated basis of $13,661,372,000 (consisting of $4,286,551,000 of parent debt, $1,771,349,000 of Arahova public debt, and approximately $7.6 billion of other subsidiary debt) as of March 31, 2001.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable. The Form 10-Q was signed by Timothy Rigas.

95.    Also on May 15, 2001, Arahova filed its Form 10-Q for the quarter ended March 31, 2001.  It reported total debt on a consolidated basis of $4,313,825,000 as of March 31, 2001. This figure did not include the Managed Entities' borrowings under the co-borrowing agreements, for which a subsidiary of Arahova was jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

96.    On June 6, 2001, Adelphia issued a press release announcing its intention to issue $400 million aggregate principal amount of the 2011 Bonds.  On June 7, 2001, Adelphia issued a press release announcing that it had increased the offering to $1 billion aggregate principal amount.

97.    On June 8, 2001, Adelphia filed the 2011 Prospectus with the SEC with respect to the issuance of $1 billion aggregate principle amount of 2011 Bonds.  According to the prospectus, as of March 31, 2001, the Company had approximately 5.8 million basic subscribers and approximately $13.7 billion in long-term debt, consisting of $4.3 billion of parent company debt, approximately $1.8 billion of Arahova public debt, and approximately $7.6 billion of other

subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The prospectus described several covenants that would be set forth in the indenture, including those described above that were set forth in the November 2009 Prospectus.  The 2011 Prospectus stated that the proceeds from the offering would be invested in cash equivalents or contributed to a subsidiary and used to repay borrowings under its revolving credit facility.  The 2011 Prospectus incorporated by reference, among other documents, Adelphia's Form 10-K for the year ended December 31, 2000 (as amended) and its Form 10-Q for the period ended March 31, 2001.  The 2011 Prospectus failed to disclose material information, including the off-balance sheet debt for which the Company was responsible under the co-borrowing agreements.  Banc of America and Salomon were joint book-running manager, as well as lead underwriters, on the offering.  The offering was completed on June 12, 2001.

98.    On July 6, 2001, Adelphia filed its proxy statement with the SEC with respect to the annual stockholders meeting scheduled for August 7, 2001.  In the proxy statement, the Company repeated selected financial data from the Company's prior financial statements, including the previously reported debt figures, and included Deloitte's audit report for the year ended December 31, 2000.  The proxy statement also disclosed the existence of the co-borrowing agreements dated March 29, 1996, May 6, 1999, April 14, 2000, and September 28, 2000, and that certain subsidiaries of Adelphia were liable for all borrowings under those agreements, but stated that the lenders had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries.  The amounts outstanding under these agreements, and in particular the amount of borrowings by Managed Entities, were not disclosed.  The proxy statement contained a report

by the Audit Committee for the year ended December 31, 2000, which stated that the Audit

Committee had reviewed and discussed the audited financial statements with Adelphia's

management, and recommended to the Board that those audited financials be included in

Adelphia's Form 10-K filing for the year ended December 31, 2000.  Adelphia's audited annual

financial statements for the year ended December 31, 2000 (which also contained audited

financial results for the year ended December 31, 1999) were included in an appendix to the

proxy statement, along with Deloitte's unqualified audit opinion thereon.

99.    On August 14, 2000, Adelphia issued a press release in which John Rigas

announced the Company's financial results for the second quarter of 2001.  On a consolidated

basis, the Company reported record quarterly revenue of $893.3 million and quarterly EBITDA

of $342.2 million.  The press release also stated that the Company had 5,672,225 basic cable

subscribers.  Timothy Rigas was quoted as saying, among other things:  "The turnaround in

[Adelphia Business's] EBITDA growth trend combined with the Cable Division's steady

performance has resulted in an acceleration of annual EBITDA growth from 7% a year ago and

10% last quarter to 14% in the current quarter.  We expect our consolidated EBITDA growth to

accelerate during the remainder of 2001 and believe we will achieve our year-end consolidated

EBITDA growth target."

100.    Also on August 14, 2001, the Company filed a Form 10-Q with the SEC which set

forth its consolidated financial results for the quarter ended June 30, 2001, including the revenue

and basic subscriber numbers set forth in its August 14, 2001 press release.  The Company

reported that it had total consolidated debt of $14,407,631,000 as of June 30, 2001, which

included approximately $5.86 billion of parent debt and approximately $8.55 billion of

subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

101.    Also on August 14, 2001, Arahova filed its Form 10-Q for the quarter ended March 31, 2001.  It reported total debt on a consolidated basis of $2,696,172,000 as of August 14, 2001.  This figure did not include the Managed Entities' borrowings under the co-borrowing agreements, for which a subsidiary of Arahova was jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

102.    On September 28, 2001, Adelphia issued a press release in which John Rigas announced the closing of a $2.03 billion secured revolving/term credit facility, which also provided for up to $750 million in additional borrowing facilities at the lenders' discretion.  The press release stated that the co-borrowers under the facility included "Adelphia subsidiaries and affiliates," and that the collateral included a pledge of the equity interests of those subsidiaries and affiliates.  The lenders under this facility included Bank of America, N.A. (an affiliate of Banc of America) and Citicorp USA, Inc. (an affiliate of Salomon).

103.    On October 23, 2001, Adelphia issued a press release announcing that it had closed on the previously announced agreements with the Rigas family to purchase approximately 5.8 million shares of Class B common stock for $42.96 per share and approximately $167.4 million principal amount of 6% convertible notes.  The press release was attached as an exhibit to a Form 8-K that was signed by Timothy Rigas and filed by Adelphia on October 23, 2001.

104.    On November 9, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 2001.  On a consolidated

36

basis, the Company reported record quarterly revenue of $898.6 million and quarterly EBITDA of $357.1 million.  The press release also stated that the Company had 5,693,035 basic cable subscribers.  Timothy Rigas was quoted as saying, among other things:  "Continuing our strong performance in digital cable and high speed data offerings allows us to maintain our previously stated guidance of 11% to 12.5% for 2001 EBITDA growth."

105.    Also on November 9, 2001, Adelphia filed a Form 10-Q with the SEC which set forth its consolidated financial results for the quarter ended September 30, 2001, including the revenue and basic subscriber numbers set forth in the November 9, 2001 press release.  The Company reported total consolidated debt of $14,849,773,000 as of September 30, 2001, which included approximately $5.8 billion of parent debt and approximately $9 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

106.    Also on November 9, 2001, Adelphia issued a press release announcing that it had sold 30 million shares of Class A common stock and $300 million of convertible preferred stock, and that the Rigas family had entered into agreements with Adelphia to purchase $50 million of the preferred stock and 7.5 million share of Class B common stock.  The press release was attached as an exhibit to a Form 8-K that was signed by Timothy Rigas and filed by Adelphia on November 12, 2001.

107.    On November 14, 2001, Arahova filed its Form 10-Q for the quarter ended September 30, 2001.  It reported total debt on a consolidated basis of $3,475,949,000 as of September 30, 2001.  The Form 10-Q disclosed that "certain subsidiaries of Adelphia and

Arahova closed on a new $2,030,000 secured revolving term facility" on September 28, 2001, but failed to disclose the amount, if any, of Arahova's liabilities under that facility or any other co-borrowing agreements, and failed to disclose the amount of the Managed Entities' borrowings under those agreements. The Form 10-Q was signed by Timothy Rigas.

108. All of the foregoing public statements by the Defendants were materially false and misleading, because they either affirmatively misrepresented the debt levels and financial condition of Adelphia and/or Arahova, or omitted material information relating thereto. Among other things:

      a.    The Defendants' statements regarding the amount of long-term debt of Adelphia and Arahova were materially false and misleading because they did not include the borrowings by the Managed Entities under the various co-borrowing agreements for which subsidiaries of Arahova and/or Adelphia were jointly and severally liable.

      b.    The Defendants' statements misrepresented or failed to disclose material information relating to related party transactions between Adelphia and its subsidiaries on one hand, and the Rigas family and the entities they own and control, on the other.

      c.    The Defendants' statements materially overstated the number of Adelphia's basic cable subscribers;

      d.    The Defendants' statements materially overstated the amount of the Company's revenue and EBITDA for 1999, 2000 and 2001, by virtue of a number of creative (and improper) accounting devices; and

e.    To the extent the Defendants' statements were forward-looking, they

lacked a reasonable factual basis and the Defendants were aware of facts

(including the undisclosed co-borrowing obligations and the Company's

overstatement of its revenue, EBITDA and subscriber numbers) that

undermined the accuracy of those statements.

109.    The omitted and misrepresented information did not begin to become public until

March 27, 2002, as described below, and LACERA and its agents neither knew nor had reason to

know such information prior to that date.  The full nature and extent of the Defendants'

misrepresentations and omissions still is not known as of the date of this complaint.

## THE TRUTH BEGINS TO EMERGE

110.    On March 27, 2002, Adelphia shocked the market when, in a footnote in its press

release announcing its fourth quarter and full year 2001 financial results, the Company revealed

that it had at least $2.284 billion in off-balance sheet debt as of December 31, 2001.  That

footnote stated:

> Certain subsidiaries of the Company are co-borrowers with certain
> companies owned by the Rigas Family and managed by the
> Company ("Managed Entities") for borrowing amounts of up to
> [$5,630,000,000]. Each of the co-borrowers is liable for all
> borrowings under the credit facilities and may borrow up to the full
> amount of the facilities. Amounts borrowed under these facilities
> by the Company's subsidiaries are included as debt on the
> Company's consolidated balance sheet. **Amounts borrowed by
> Managed Entities under the facilities are not included on the
> Company's consolidated balance sheet.** The Company expects
> the Managed Entities to repay their borrowings in the ordinary
> course. The Company does not expect that it will need to repay the
> amounts borrowed by the Managed Entities. **As of December 31,
> 2001, co-borrowing credit facilities balances, net of amounts
> otherwise reflected as debt on the Company's consolidated**

39

**balance sheet, totaled approximately [$2,284,000,000]**....
[emphasis added]

Reference is made to the Company's Annual Report on Form 10-K
to be filed for the year ended December 31, 2001 for further
information.

111.    The footnote to the March 27, 2002 press release was the first public disclosure of

the fact that Adelphia's consolidated balance sheets did not include the Managed Entities'

borrowings under the co-borrowing agreements.

112.    The March 27, 2002 press release also stated that the Company had 5,810,253

basic cable subscribers, and announced the Company's fourth quarter and year-end financial

results, including record consolidated quarterly revenue of $950 million, quarterly EBITDA of

$395.3 million, annual revenue of $3,580.1 million (up 23% since 2000), and annual EBITDA of

$1,409.4 million (up 29% since 2000).  Subsequent announcements would reveal each of those

figures to be materially overstated.  Timothy Rigas was quoted in the press release as saying,

among other things:

> We are pleased with the results we have delivered for 2001.
> During the year, we made significant progress rebuilding our cable
> systems and delivering growth in new product deployments while
> maintaining our focus on strong operating results.  We have
> continued to prioritize our plant rebuild project, building down to
> less than 150 homes per node, which we believe will provide the
> platform for new product deployments and interactive ventures as
> well as expand our reach to new data and digital subscribers....  We
> expect pro forma revenue and EBITDA for the full year 2002 to
> grow between 12.0%-13.0%, respectively, as compared to pro
> forma 2001 results.  Given our continued efforts to rebuild and
> open up our plant to new customers, we are increasing our 2002
> digital and data subscriber guidance to 2.7 million digital
> subscriptions and 775,000 high-speed data customers.  We also
> expect basic subscriber growth to be consistent with 2001.  We
> believe our strong track record of solid operating results, a solid

> collection of cable assets and a stronger balance sheet will provide
> the framework for accelerated growth rates and new opportunities
> for 2002.

These statements were materially false and misleading because, among other reasons, the

Company did not have a "strong track record of solid operating results" or a strong balance sheet.

To the extent the statements were forward-looking they lacked a reasonable factual basis, and

Timothy Rigas was aware of facts (such as the Company's overstatement of its revenue,

EBITDA and subscriber levels, and understatement of its debt obligations) that undermined the

accuracy of those statements.

113.    Later on March 27, 2002, Adelphia disclosed in a conference call that an

undisclosed amount of the Managed Entities' borrowings under the co-borrowing agreements

had been used by the Rigas family to purchase Adelphia securities, and that the $2.28 billion was

secured by assets that included cable systems with about 300,000 customers.  Neither the size of

the borrowings, nor the fact that the money was used by the Rigas family, had been previously

disclosed.

114.    Also on March 27, 2002, Adelphia Business and certain of its subsidiaries filed

for bankruptcy protection under Chapter 11, and Adelphia announced that it may be liable for

$500 million in unsecured bank debt of one of the bankrupt Adelphia Business subsidiaries,

which was an unrestricted borrower under a joint credit facility for which Adelphia subsidiaries

were guarantors.  Adelphia also stated that it had agreed to provide debtor-in-possession

financing of up to $67.5 million so that Adelphia Business could continue day-to-day operations

while it reorganizes, that the bankruptcy presents potentially material risks and uncertainties to

Adelphia, and that Adelphia may not be able to realize any significant amount on claims against Adelphia Business and its subsidiaries.

115.    On April 1, 2002, Adelphia and Arahova announced that they were delaying the release of their Annual Reports on Form 10-K for the year ended December 31, 2001, so they could "review[] certain accounting matters relating to co-borrowing credit facilities" which they were parties to.

116.    On April 3, 2002, the Company disclosed that the SEC was conducting an informal inquiry into the co-borrowing agreements.

117.    On April 4, 2002, the Company announced that it had hired a law firm and three financial advisors (including Banc of America and Salomon), to explore ways to reduce Adelphia's debt and strengthen its balance sheet, including a possible sale of cable assets.

118.    On April 16, 2002, the Company announced that it was continuing to review the accounting treatment of matters relating to its co-borrowing agreements, that it would not be able to meet its extension to file its 2001 Form 10-K, that there were "a number of possible outcomes with respect to the Company's consolidated financial statements for 2001 and certain prior years" regarding the co-borrowing agreements.  The Company also stated that it was reviewing the accounting treatment in its subsidiaries' financial statements of $500 million of unrestricted co-borrowing obligations of an Adelphia Business subsidiary and the related impact as a result of Adelphia Business's bankruptcy filing.

119.    On April 17, 2002, Adelphia disclosed that the SEC had launched a formal investigation into the Company's co-borrowing agreements.

120.    On April 18, 2002, after the markets closed, Adelphia said that its securities were subject to delisting from the NASDAQ stock market.

121.    On May 2, 2002, the Company announced that it expected to restate its previously issued financial statements for 1999 and 2000 and its interim financial statements for 2001.  The Company stated that it had "tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements associated with amounts payable directly or indirectly by certain Rigas family owned entities, primarily incurred in connection with other Rigas entities which purchased Adelphia securities, as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity."  As of that date, the Company estimated that these borrowings approximated $1.6 billion as of December 31, 2001, $1.2 billion as of December 31, 2000, and $700 million as of December 31, 1999.

122.    On May 15, 2002, the Company announced John Rigas's resignation as Chairman, President and CEO.  The Company further announced that Deloitte's auditing work on the Company's financial statements for the year ended December 31, 2001 would be suspended while the Company continued its investigation of issues raised in connection with the preparation of its Form 10-K.  Also on May 15, Adelphia, Arahova, and another Adelphia subsidiary missed a total of $38.3 million in interest payments on their outstanding debt securities (including a $23.4 million interest payment on the November 2009 Bonds), and Adelphia missed an approximately $6.5 million dividend payment on its preferred stock.

123.    On May 16, 2002, the Company announced Timothy Rigas's resignation as Executive Vice President, CFO, Chief Accounting Officer, and Treasurer.  The Company also announced the appointment of a Special Committee of the Board (consisting of defendants

Gelber, Coyle, and Kailbourne), with "broad powers to conduct a full and thorough investigation into a number of issues, including ones regarding transactions between the Company and certain entities controlled by the Rigas family."

124.    Also on May 16, 2002, Adelphia and Arahova filed notices with the SEC indicating that the filing of their Form 10-Q reports for the quarter ended March 31, 2002 would be delayed as a result of their continuing review of "certain accounting matters, including those relating to certain co-borrowing credit facilities" to which they were parties.

125.    On May 17, 2002, the Company announced that it was being investigated by grand juries in two states.

126.    On May 19, 2002, the Company announced defendant Brown's resignation as Vice President of Finance.  Brown had worked for Adelphia for eighteen years, and had signed certain of the co-borrowing agreements on behalf of Adelphia's subsidiaries.  No reason was given for his resignation.

127.    On May 23, 2002, the special committee of Adelphia's board of directors (the "Special Committee") announced that the Rigas family had agreed to relinquish control of the Company, and that the Rigas Parties had resigned their positions as directors and officers of the Company.  The Special Committee further announced that the Company had tentatively concluded that it would have to increase the amount of indebtedness to be reflected on the Company's financial statements to $2.5 billion as of December 31, 2001, to reflect the full amount of principal borrowings and interest expense by entities affiliated with the Rigas family under co-borrowing arrangements with the Company, and that "this higher amount ... includes co-borrowing debt associated with Rigas family entities that are valued at approximately $1

44

billion." The Company stated that it believed that, as of April 30, 2002, "the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion," and that the proper accounting treatment for this increased indebtedness had not yet been determined.

128.    Also on May 23, 2002, the Company announced that it believed it was not in compliance with certain covenants in its public indentures, including restrictions on the Company's ability to enter into related party transactions without approval by the independent members of the Board. The Company stated that, unless cured, its failure to make $38.3 million in interest payments on its outstanding bonds would result in defaults under the indentures for those bonds and cross-defaults under the indentures for its other public debt securities.

129.    On May 24, 2002, the Company filed a Form 8-K with the SEC, stating that it had not yet completed its financial statements for the year ended December 31, 2001, received its independent auditors' report thereon, or filed with the SEC its Form 10-K for the year ended December 31, 2001. The Company also stated that in May 2002, Deloitte had suspended its auditing work on the Company's financial statements for the year ended December 31, 2001. In the Form 8-K, the Company disclosed a number of previously undisclosed (or inadequately disclosed) relationships and transactions involving the Company and its subsidiaries, on the one hand, and members of the Rigas family and entities controlled by them, on the other hand. The Company stated that defendants John J. Rigas, Timothy J. Rigas, James P. Rigas and Michael J. Rigas had refused to review, or provide information for, the Form 8-K.

130.    On May 28, 2002, Adelphia announced the appointment of Leonard Tow and Scott Schneider to the Board. Tow, together with certain family trusts, owns approximately 12%

of Adelphia's common stock, and is Chairman and CEO of Citizens Communications.

Schneider is Vice Chairman of Citizens Communications.

131.    On May 29, 2002, the Wall Street Journal reported that Adelphia was in negotiations to sell about one million of its subscribers and to raise about $1 billion in additional funding, and that the Company could run out of cash within the following ten days unless it got a sizeable investment or sold some assets.

132.    On May 30, 2002, NASDAQ announced that it would delist Adelphia's securities, effective upon the open of business on June 3, 2002, based on Adelphia's failure to timely file its periodic reports with the SEC, and further based on "public interest concerns."

133.    On May 31, 2002, Adelphia announced that its subsidiaries were in default on certain bank loans due to Adelphia's failure to provide the lenders with financial information and related compliance certificates.  Adelphia further announced that, as a result of its delisting by NASDAQ, it would be required to make an offer to purchase certain outstanding debt securities.

134.    On June 5, 2002, the Wall Street Journal reported that Salomon had become a focus of the SEC's investigation of Adelphia.  It was reported that the SEC was looking at the involvement of Salomon's parent company, Citigroup Inc., in the co-borrowing agreements, and what Salomon knew when it served as the lead underwriter for Adelphia's recent bond offerings.

135.    On June 7, 2002, the Wall Street Journal reported that Adelphia had inflated the number of its cable television subscribers by between 400,000 and 500,000, or as much as 10% of the Company's total customer base.  It also reported that investigators have uncovered evidence that Adelphia kept two sets of accounting books for its capital expenditures, with the

46

one that was shown to Wall Street overstating the amount Adelphia spent to upgrade its cable systems.

136.    On June 9, 2002, the Company terminated Deloitte as its independent accountants and auditors.  Later that day, the Company received a letter from Deloitte in which Deloitte stated that it was not prepared to resume its audit because the Company continued to employ executives who might have been involved in inappropriate conduct relating to the Company's financial reporting.  In the letter, Deloitte stated:  "To the extent that any of those persons have been involved in illegal activities, there is no way that we would be willing to rely on their representations, and indeed the mere fact that they remain in their positions raises additional concerns."

137.    On June 10, 2002, the Company filed a Form 8-K which stated that, based on the preliminary results of the Special Committee's investigation, current management of the Company had determined that it would make adjustments to its results of operations for 2000 and 2001 and its guidance with respect to management's expectations regarding EBITDA for 2002, and that it would revise certain previous public statements regarding the number of subscribers to the Company's cable television systems because those statements were inaccurate.  The Form 8-K contained the Company's preliminarily revised consolidated revenues and EBITDA for 2000 and 2001, which reflected: (a) a $160 million (15.3%) reduction in consolidated EBITDA for 2000; (b) a $210 million (17.5%) reduction in consolidated EBITDA for 2001; (c) a $60 million reduction in consolidated revenues for 2000; and (d) a $70 million reduction in consolidated revenues for 2001.  The Company stated that the revised estimates of EBITDA for 2000 and 2001 "correct[] the items in the previously announced operating results that current management

believes were erroneous, and reflects more conservative accounting policies that the Company intends to follow in the future."  The Company further stated that its new management believes EBITDA for the first quarter of 2002 was approximately equal on an annualized basis to the preliminary revised EBITDA for the full year 2001.

138.     Also on June 10, 2002, Arahova filed for bankruptcy protection under Chapter 11.  It stated that it made this move because it was notified that ML Media Partners LP intended to seize control of the joint venture between Arahova and ML Cable by foreclosing on the half owned by Arahova.

139.     Also on June 10, 2002, Leonard Tow and Scott Schneider resigned from Adelphia's Board after less than two weeks of service.  In a letter to defendant Kailbourne, Tow said that "revelations of the unreliability of corporate data, as well as the ongoing serial disclosures of wrongdoing, have made it impossible to contribute meaningfully to the process" of restoring the Company's credibility and stabilizing it financially.

140.     On June 11, 2002, Adelphia announced the resignation of Venetis from the Board.

141.     On June 14, 2002, Adelphia filed a Form 8-K announcing its retention of PricewaterhouseCoopers, LLP ("PwC") to replace Deloitte as its independent accountants.  In that Form 8-K, Adelphia also discussed the investigation by the Special Committee, and stated that the Special Committee had "identified accounting and disclosure issues, some of which raised questions about whether the Company's management had engaged in improper activities."  The Company stated that, when Deloitte suspended its audit of the Company's 2001 financial statements on May 14, 2002, it provided the Company with a list of issues that needed to be resolved before issuance of the 2001 Form 10-K, including "circumstances that raised questions

about whether employees of the Company had falsified accounting records and/or engaged in other conduct in violation of the law."

142.    In its Form 8-K dated June 14, 2002, the Company provided additional details regarding some of the related party transactions that had been disclosed in its early Form 8-K dated May 24, 2002.

143.    On June 17, 2002, Adelphia issued a press release announcing that it had missed a $51,250,000 interest payment on its debt securities (later identified as the 2011 Bonds) and that Arahova had missed a $4,187,500 interest payment on its senior debt.  Adelphia also announced that, based on the Company's decision to restate its financial statements, Deloitte was withdrawing its certifications of the financial statements issued by Adelphia and its subsidiaries since March 2001.

144.    On June 25, 2002, Adelphia filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  On the same date, Adelphia announced that it had reached an agreement for a $1.5 billion debtor-in-possession loan, for which Salomon's parent company, Citigroup USA, was a lead arranger and lender.

145.    Each of these announcements had a detrimental impact on the trading price of the Company's securities.  The closing price of Adelphia's Class A common stock dropped from $20.39 per share on March 26, to $16.70 on March 27, $14.90 on March 28, $13.12 on April 1, $11.04 on April 3, $7.25 on April 17, $5.70 on May 14, $2.62 on May 23, $1.16 on May 30, $0.70 on May 31, $0.23 on June 10, and $0.14 in over-the-counter trading on June 13 – down more than 99% since March 26.  The price of Adelphia's bonds also dropped materially in response to the adverse news:  For example, the 2010 Bonds fell about 9 cents on the dollar on

March 27 (to a bid of 97 cents) and an additional 6 cents on March 28 (to a bid of 91 cents), and subsequently fell to a bid of about 67 cents (on May 16). Standard & Poor's reduced Adelphia's bond rating from BB- on March 28, 2002, to CCC+ on April 22, 2002, to C- on May 20, 2002 (except for the November 2009 Bonds, which were reduced to a D rating on May 20 due to the missed interest payments). The other Bonds have likewise dropped in price.

## DEFENDANTS' IMPROPER ACCOUNTING SCHEMES

146.   As reflected in the Company's Form 8-K dated June 10, 2002, the Rigas Parties used a number of manipulative accounting practices in order to artificially inflate Adelphia's revenue and EBITDA figures for at least the years 2000 and 2001. The Company has preliminarily revised its financial results for those years to reflect adjustments relating to the following items:

> a.   **Marketing support agreements.** Beginning at least as early as 2000, the Company entered into agreements with its two main vendors of digital converter boxes to raise the price paid by the Company for "set-tops" by $26 per set-top, and to separately receive the same amount from the vendors for "marketing support." The Company did not provide a material amount of marketing support in exchange for such payments. The marketing support payments were improperly treated as a reduction of the Company's operating expenses, and the payments for the boxes inflated the Company's capital expenditures. The Company has stated it believes proper accounting for these matters will reduce EBITDA by approximately $54 million in 2001 and $37 million in 2000.

b.      **Interactive Cable Services.**  Certain interactive cable service providers, whose services were carried on the Company's cable television systems, paid the Company with their financial instruments, whose value had been impaired.  The Company's March 27, 2002 announcement of its operating results for 2001 included the payments from these providers in revenue, and the impairment of the financial instruments was not reflected in EBITDA.  The Company has stated that it now believes both revenue and EBITDA should be reduced by the amount of this impairment, and that it expects this adjustment to reduce revenue and EBITDA by $52 million 2001 and by $28 million in 2000.

c.      **Programming Adjustment.**  The Company has contracts with providers of cable television programming under which the Company makes fixed payments over a number of years.  The Rigas Parties determined the amount per subscriber to be charged as an expense in any year by estimating the number of subscribers who would receive the service over the life of the contract and dividing that figure into the total amount paid by the Company over the life of the contract.  This resulted in a lower expense during the early years of a contract than if the Company had simply reflected the contract payments due in such years as an expense. The Company's new management believes that, due to the uncertainty in the number of subscribers who will receive these services, the more appropriate way to account for these contracts is to charge the amount due

under the contracts each year as an expense for the year.  The Company expects this change to reduce EBITDA by approximately $42 million in 2001 and $23 million in 2000.

d.    **Capitalization of Labor Expenses.**  In reporting results during 2001 and prior periods, the Company capitalized certain labor expenses, such as those associated with reconnecting disconnected subscribers and operating customer service centers and other overhead items.  The Company's new management believes these labor expenses should have been expensed rather than capitalized.  This change is expected to reduce EBITDA by approximately $40 million for each of 2000 and 2001.

e.    **Related Party Transactions.**  The Company entered into a number of transactions with Adelphia Business, the Rigas Parties, various Rigas family-controlled entities, and/or other parties, which had the effect of artificially increasing the Company's reported EBITDA.  These transactions included:  increasing the management fees charged by the Company to the Managed Entities; transferring approximately $4 million in expenses from Adelphia to a joint venture controlled by Adelphia Business; and entering into arrangements with third parties under which Adelphia was allowed to accrue additional fee income.  The Company has stated that it has been unable to substantiate these arrangements, and therefore expects to exclude the fee income under these arrangements from

gross revenues, reducing EBITDA by approximately $18 million in 2001 and $19 million in 2000.

f.  **Deferred Billing Arrangements.**  During the Rigas Parties' tenure in management, they caused the Company to recognize revenue ratably over the expected period of service under a new or enhanced service arrangement, even if the contract called for the initial months of service to be free.  The Company has now determined that revenue should not be recognized until the customer payments begin.  This change is expected to reduce revenue and EBITDA by approximately $4 million for 2001 and approximately $13 million for 2000.

147.    In addition to the foregoing, the Defendants engaged in at least the following manipulative accounting schemes:

a.  **Transfer of Digital Converter Boxes.**  Adelphia made a bulk purchase of set-top digital converter boxes at a discount, and transferred $100 million worth of those boxes to a Managed Entity.  The Managed Entity, which had no need for the boxes, paid for them in the form of a company receivable.  The net effect was to artificially reduce Adelphia's debt load by parking the unneeded goods in the Managed Entity.

b.  **Overstatement of Capital Spending.**  Adelphia kept two sets of accounting books with regard to its capital spending.  The information it provided to Wall Street analysts indicated that the Company was

53

upgrading about 50% of its cable television system.  In reality, the

Company upgraded less than 40%.

148.    As a result of these manipulative accounting practices, Adelphia's financial

results as reported in its press releases, SEC filings, prospectuses, and other public statements

during 1999, 2000 and 2001 were materially false and misleading.

**DEFENDANTS' MISREPRESENTATIONS OF THE COMPANY'S SUBSCRIBER BASE**

149.    The size of the subscriber base of Adelphia and its subsidiaries is a material fact

to the Company's investors (including LACERA), and is widely relied upon to gauge the

Company's strength.

150.    At all relevant times, the Company's public disclosures regarding its number of

subscribers were materially overstated.

151.    On March 27, 2002, the Company stated that its cable systems had 5,810,253

"basic cable subscribers" as of December 31, 2001.  Actually the Company's subscriber base was

between 7% and 10% less.

152.    The overstatement was the result of, among other things, the Company's

application of a different accounting system for purposes of its public disclosures than it used

internally.  For example, unlike the Company's internal figures, its publicly disclosed figures

counted connections to multifamily units as multiple connections, even if there was only one

paying subscriber.  They also counted customers who purchased high-speed Internet connections

as cable subscribers.

153.    On June 10, 2002, the Company  filed a Form 8-K admitting that its March 27,

2002 press release had overstated its subscriber base by more than 47,000 subscribers.  This

discrepancy resulted from an overstatement of the number of subscribers who receive service under bulk billing arrangements -- a statistic which the Company does not have, but which new management believes is approximately 47,000 less than the figure used by the Rigas Parties. The Company has yet to admit or disclose the improper accounting methods which resulted in an even greater overstatement of the subscriber base.

## THE CO-BORROWING ARRANGEMENTS
## AND OTHER UNDISCLOSED TRANSACTIONS

**A.    Adelphia CMS and Related Party Balances**

154.    The Company operates a cash management system on behalf of Adelphia, its subsidiaries, and other entities controlled by Rigas family members, including the Managed Entities (collectively, the "Adelphia CMS Participants"). Each Adelphia CMS Participant (i) deposits all or some of its cash generated or otherwise obtained from its operations, borrowings and other sources into the Adelphia CMS, (ii) withdraws cash from the Adelphia CMS to be used for its expenses, capital expenditures, repayments of debt and other uses, and (iii) engages in transfers of funds with other Adelphia CMS Participants.

155.    The operation of the Adelphia CMS results in the commingling of funds among the Adelphia CMS Participants, which include Company subsidiaries and entities controlled by the Rigas family. These transactions create numerous related party payables and receivables among the Adelphia CMS Participants. In addition, transactions involving Adelphia CMS Participants sometimes result in payables and receivables between and among various Adelphia CMS Participants and/or other Rigas family members and/or the entities they control. Certain adjustments to these payables and receivables are recorded between the parties on a quarterly basis through accounting entries.

156.    The Company's Board of Directors did not approve the structure or operation of the Adelphia CMS, including the commingling of funds among the Adelphia CMS Participants, nor were these matters publicly disclosed by the Company prior to May 24, 2002.

**B.    The Company's Co-Borrowing Credit Facilities**

157.    Certain of the Managed Entities are co-borrowers with certain of the Company's subsidiaries, including Arahova, under revolving credit and term loan agreements.  Each co-borrower under each of these credit facilities may borrow up to the entire amount of the available credit under the applicable facility.  Each co-borrower is jointly and severally liable for the entire amount of the indebtedness under the applicable co-borrowing credit facility regardless of whether that co-borrower actually borrowed that amount.

158.    Borrowings under the co-borrowing credit facilities are generally deposited in the Adelphia CMS.  On a quarterly basis, the Company records journal entries to record the indebtedness attributed to the co-borrowers with corresponding adjustments to their receivables or payables.  Such adjustments are based on consideration of the net effect of quarterly transactions between the Company and certain of its subsidiaries, on the one hand, and the Managed Entities, on the other hand.  Notwithstanding these adjustments, all co-borrowers remain jointly and severally liable to the lenders for all borrowings under the co-borrowing credit facility.

159.    During the year ended December 31, 2001, the Company's subsidiaries were parties to the following co-borrowing credit facilities:

a.    On March 29, 1996, Telesat Acquisition Limited Partnership ("TALP"), Global Acquisition Partners, L.P., (a subsidiary of the Company) and HVA

(a Managed Entity), entered into a $200 million co-borrowing loan agreement. TALP was a subsidiary of Olympus, which until October 1999 was a joint venture owned by the Company and FPL Group, Inc. One of the lenders under the agreement was NationsBank of Texas, N.A., which merged with and into Bank of America (Banc of America's parent company) on September 30, 1998, at which time Bank of America assumed NationsBank of Texas's obligations under the agreement. This agreement was refinanced and terminated on September 28, 2001.

b.    On May 6, 1999, UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P. and Tele-Media Company of Hopewell-Prince George (each a subsidiary of the Company), and HHC (a Managed Entity), closed on an $850 million co-borrowing credit facility with several banks (including Salomon and Bank of America, N.A., an affiliate of Banc of America), which consists of a $600 million 8-1/2 year reducing revolving credit loan and a $250 million 9 year term loan, and which remained in effect at December 31, 2001. As of December 31, 2001, the full $850 million credit facility had been drawn down, with $210 million of the co-borrowings being attributable to the Company and its subsidiaries, and the other $640 million being attributable to HHC (a Managed Entity). As of April 30, 2002, $831 million was outstanding under this credit facility. The

Company (through its subsidiaries) is jointly and severally liable for the full amount of all co-borrowings.

c.    On April 14, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, (each a subsidiary of Adelphia and/or Arahova), and HPGI (a Managed Entity), closed on a $2.25 billion co-borrowing credit facility, consisting of a $1.5 billion 8-3/4 year reducing revolving credit loan and a $750 million 9 year term loan.  Banc of America was a co-lead arranger and lender, and Citibank, N.A. (an affiliate of Salomon) was a managing agent and lender, under this credit facility.  In addition, on September 28, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, and HPGI, closed on a $500 million 9-1/4 year term loan.  This term loan is part of the credit facility that closed on April 14, 2000, and all of the indebtedness under this facility remained outstanding at December 31, 2001.  ABSO, an unrestricted borrower under the revolving credit portion of this co-borrowing credit facility, borrowed $500 million in a number of transactions.  The proceeds of these transactions were deposited into the Adelphia CMS.  The Company's subsidiaries under this credit facility and HPGI are each jointly and severally liable for the ABSO borrowings.  ABSO, as an unrestricted borrower, is liable only for its own borrowings.  ABSO is one of the Adelphia Business subsidiaries which filed for bankruptcy court protection on March 27, 2002.  As of December 31, 2001, $2.2 billion of this credit facility had been drawn down, with

$1,039,361,333 in co-borrowings being attributable to the Company and its subsidiaries, and the remaining $1,160,638,667 being attributable to Managed Entities.  As of April 30, 2002, $2.48 billion in co-borrowings had been drawn down.  The Company is jointly and severally liable for the full amount of all co-borrowings.

d.    On September 28, 2001, Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut and Adelphia Holdings 2001, LLC (each a subsidiary of the Company), and HVA and CTCC (both Managed Entities), closed on a $2.03 billion co-borrowing credit facility with several banks, including Bank of America, N.A. (an affiliate of Banc of America) and Citicorp USA, Inc. (an affiliate of Salomon).  The credit facility consists of a $765 million 8-3/4 year reducing revolving credit facility, a $765 million 8-3/4 year term loan, and a $500 million 9 year term loan, all of which remained in effect at December 31, 2001.  A portion of the proceeds from this facility were used to repay and terminate the $200 million co-borrowing credit facility dated March 29, 1996.  As of December 31, 2001, $1.99 billion had been borrowed under this credit facility, with $1,340,971,553 being attributable to Adelphia and its subsidiaries and $649,028,447 being attributable to Managed Entities.  As of April 30, 2002, $1.265 billion was outstanding under this credit facility. The Company is jointly and severally liable for the full amount of the co-borrowings.

160.    As of December 31, 2001, the maximum aggregate amount that could be borrowed by the co-borrowers under all of the co-borrowing credit facilities was $5.63 billion. As of that date, the aggregate amount borrowed under these facilities was $5.04 billion. As of April 30, 2002, the total amount outstanding was approximately $4.58 billion.

161.    Annual interest rates under the co-borrowing credit facilities described above are based upon one or more of the following rates at the option of the co-borrowers: prime rate plus 0% to 2.0%; or LIBOR plus .625% to 3.0%. At December 31, 2001, the weighted average interest rate on notes payable to banks and other institutions under these agreements was 4.31%. Borrowings under these credit facilities are collateralized by a pledge of the stock of each co-borrower, and the stock of the co-borrower's pledged or guarantor subsidiaries.

162.    The Company did not follow a general practice of seeking the approval of the Board of Directors or the independent directors of the Board of Directors of specific drawdowns under the co-borrowing credit facilities.

163.    The size of the borrowings under these co-borrowing credit facilities was not publicly disclosed prior to March 27, 2002, and even then the full amount was not disclosed.

**C.    Securities Purchases by Rigas Family Members And Rigas-Controlled Entities**

164.    Highland 2000, which is owned and controlled by the Rigas Parties and Ellen Rigas Venetis, has entered into a number of transactions since January 1, 2001, relating to the acquisition of debt or equity securities of the Company. In each of these transactions, the "purchase price" for the securities was settled through a series of bookkeeping entries as follows:

    a.      The securities were issued by the Company to Highland 2000, and the Company recorded a receivable from Highland 2000 for the amount of the purchase price.

    b.      An obligation of one of the Company's subsidiaries under a co-borrowing facility was reallocated to a Managed Entity in an amount equal to the purchase price, and the Company recorded a payable to the Managed Entity for the amount of the purchase price.  Notwithstanding this reallocation, the Company's subsidiaries that are parties to that facility remained jointly and severally liable for all amounts thereunder.

165.    At least the following Adelphia securities have been purchased to date by Highland 2000 pursuant to this arrangement:

    a.      October 22, 2001:  5,819,367 shares of Class B common stock, for an aggregate purchase price of $259,900,000, pursuant to an agreement dated January 17, 2001;

    b.      October 22, 2001:  $167,400,000 aggregate principal amount of 6% convertible subordinated notes due 2006, for an aggregate purchase price of $162,500,000, pursuant to an agreement dated January 17, 2001;

    c.      January 22, 2002:  $400,000,000 aggregate principal amount of 3.25% convertible subordinated notes due 2021, for an aggregate purchase price of $393,500,000, pursuant to an agreement dated April 19, 2001.

166.    Highland 2000 is scheduled to close on purchases of the following additional Adelphia securities on August 12, 2002, pursuant to an agreement dated November 9, 2001:

a.     7,500,000 shares of Class B common stock, for an aggregate purchase price of $154,050,000; and

b.     2,000,000 shares of 7.5% Series E mandatory convertible preferred stock, for an aggregate purchase price of $48,500,000.

167.     The Special Committee has been investigating these transactions, and has announced that its preliminary findings indicate that certain employees of the Company may have prepared documentation for the October 2001 purchases in January 2002 (i.e., after the fact), including wire transfer receipts and bank paydown and drawdown notices, to support the accounting treatment of those purchases as cash transactions.  In fact, they were not cash transactions.

168.     Although Adelphia disclosed the above transactions in its SEC filings and other public documents, the manner of settlement of the purchase price was not disclosed.

169.     The purchase price for the securities sold to Highland 2000 in the above transactions was equal to the public offering price less the underwriters' discount for a similar class of securities being sold to the public at the time the relevant purchase agreement was entered into.  The public offering price was established by a committee of the Board of Directors, comprised solely of members of the Rigas family, in negotiations with the underwriters.  In each case, before the public offering price was established the amount of securities to be purchased by Highland 2000 and the pricing mechanism for each transaction was approved by a majority of the independent directors of the Board of Directors. The provisions of the relevant agreements approved by the independent directors of the Board of Directors provided that the purchase price would be paid in immediately available funds.

170.    On February 1, 2001, Highland Holdings purchased 100,000 shares of Adelphia Class A common stock in the open market, for an aggregate purchase price of $4,452,000. These shares were purchased with cash withdrawn from the Adelphia CMS. The source of these funds was not publicly disclosed prior to May 24, 2002.

171.    Certain members of the Rigas family and certain entities controlled by them have entered into margin loan agreements with various investment banks and other financial institutions and pledged equity and debt securities issued by the Company to secure such loans. Since January 1, 2001, such persons have made $241,167,006 of payments in connection with margin calls. Of that amount, $177,789,669 has been paid in 2002, with approximately $174,638,151 having been paid since March 27, 2002. Funds for these margin call payments came from the Adelphia CMS. The use of the Adelphia CMS to fund margin calls on behalf of Rigas family members of Rigas-controlled entities was not presented to or approved by the Board of Directors or the independent directors of the Board of Directors, nor was it publicly disclosed prior to May 24, 2002.

**D.    Management Services Provided by the Company**

172.    During the year ended December 31, 2001, the Company provided management services to the Highland Prestige Entities. These services included supervision of technical and business operations, accounting, marketing, programming, purchasing, field engineering and other technical and administrative nonfield services. During this period, the Highland Prestige Entities paid the Company up to 5% of system revenues for such services. Other fees were charged by the Company during this period for goods and services including management fees,

placement fees associated with completed and pending acquisitions, and other goods and services provided to the Highland Prestige Entities.

173.    For the year ended December 31, 2001, the total aggregate amount of all fees and expenses that Highland Prestige Entities was charged by the Company was $7,793,000.  The Special Committee has announced that it is investigating whether these amounts were actually paid to the Company.

174.    During the year ended December 31, 2001, the Company provided similar management services to Highland Holdings, Doris L.P., and NFHLP.  For the year ended December 31, 2001, Highland Holdings paid $3,944,000 for such services, Doris L.P. paid $3,675,000, and NFHLP paid $3,417,000.  The Special Committee has stated that funds for the payments by NFHLP appear to have come from the Adelphia CMS, and that it is investigating whether management fees paid by Highland Holdings to the Company were paid using borrowings under a co-borrowing credit facility.  The Special Committee is also investigating whether these management fees may have been effectively offset by the assumption by the Company or one of its subsidiaries of obligations, including interest payment obligations, of Rigas family members or Rigas family-controlled entities, and whether these offsetting transactions were undertaken solely to increase the Company's revenues.

**E.    The Company's Payments to Managed Entities and Other Affiliates for Products and Services**

175.    During the year ended December 31, 2001, the Company entered into a number of transactions with related parties which were neither presented to nor approved by the Board of Directors or the independent directors of the Board.  These transactions, which also were not publicly disclosed until May 24, 2002, included:

64

a.      payment of approximately $12,416,000 to EI (wholly owned by John

Rigas) and $371,000 to Dobaire (wholly owned by John Rigas's wife),

primarily for office furniture and fixtures and related services (a Company

manual required that all furniture be purchased from EI);

b.      payment of approximately $2,019,000 to Wending Creek for various

maintenance and related services;

c.      payment of approximately $100,000 to Rigas family members and Rigas

family-controlled entities for office and warehouse rent, including $41,700

to Ellen Rigas Venetis, $34,000 to Dorellenic, $12,000 to John Rigas,

$6,600 to the Coudersport Theatre, and $1,200 to Wending Creek; and

d.      payment of approximately $50,000 to Ellen Rigas Venetis for community

service and public relations consulting services.

**F.      The Buffalo Sabres Transactions**

176.    The Company, through its subsidiary Empire Sports Network, L.P. ("ESN"), has

from time to time made loans to NFHLP, a limited partnership owned by the Rigas Parties.

NFHLP owns the Buffalo Sabres, a team in the National Hockey League.  ESN broadcasts the

games of the Sabres.  The Company has also provided financing to assist the Rigas Parties in

their acquisition of all ownership interests in NFHLP.

177.    In July 2000, the Rigas Parties acquired all the partnership interests of NFHLP

from an investor group.  In connection with the closing of this acquisition, John Rigas paid

approximately $25 million to NFHLP.  Of that amount, approximately $15 million was paid by

NFHLP to the Company to pay down part of the outstanding debt owed to the Company.  Shortly

after the closing, the Rigas Parties undertook a recapitalization of NFHLP.  As part of the recapitalization, NFHLP's then-outstanding obligations to the Company (after giving effect to the $15 million paydown) were converted into (i) an approximately $46.5 million aggregate principal amount, 10% partially subordinated note due in July 2010 and (ii) an approximately $30 million aggregate principal amount, 10% fully subordinated note due July 2010 (collectively, the "NFHLP Notes"). Approximately $9.6 million of outstanding advances to NFHLP from the Company were not converted into the NFHLP Notes as part of the recapitalization (the "Pre-Recapitalization Advances").  John Rigas also contributed to the capital of NFHLP over $22 million of debt obligations owed to him by NFHLP.

178.    Prior to the recapitalization of NFHLP and in connection with obtaining the consent of the NFHLP's existing bank lenders to the sale, the Company also purchased two NFHLP loans from these bank lenders in the amount of $33,581,000 ("NFHLP Bank Loans"), after giving effect to a $7,785,000 discount in the purchase price paid by the Company for one loan.

179.    In addition, the Company guaranteed a third NFHLP loan in the aggregate principal amount of approximately $27,000,000. The Special Committee is investigating the nature of this guaranty and whether it may have been collateralized by letters of credit.

180.    From time to time, NFHLP finances its operations through withdrawals of cash (and the generation of net payables to the Company) under the Adelphia CMS (the "NFHLP Advances").

181.    As of December 31, 2001, the total amount outstanding under the NFHLP Notes, NFHLP Bank Loans, NFHLP Advances and the Pre-Recapitalization Advances (including all

accrued interest thereon) was $150,157,000, before giving effect to a reserve of $19,889,000 the Company has established on its books. The amount of the reserve was included in prepaid expenses and other assets of the Company at such date. The amount outstanding under the NFHLP Notes, NFHLP Bank Loans, NFHLP Advances and Pre-Recapitalization Advances at December 31, 2001 was the largest amount of such indebtedness outstanding during the year ended December 31, 2001.

182. Under the terms of the agreements between ESN and NFHLP:

a. ESN paid NFHLP $7,226,000 for television and radio broadcasts rights during the year ended December 31, 2001, comprising a portion of the $3,200,000 owed to NFHLP for the 2000-2001 season and a portion of the $10,000,000 owed to NFHLP for the 2001-2002 season;

b. Empire Sports Services ("ESS"), a joint venture between NFHLP and ESN, is responsible for the production of television and radio coverage of the Sabres games and the sales of commercial time on ESN. ESS's revenues and its associated expenses are split between NFHLP and ESN evenly. During the year ended December 31, 2001, each of ESN and NFHLP earned approximately $1,735,000 under this arrangement. In connection with sales of non-Buffalo Sabres programming, ESS pays 75% of the revenues of such sales to ESN. For the year ended December 31, 2001, ESS paid ESN $1,111,000 under this arrangement.

c. The Company paid $744,000 to NFHLP (net of certain payables due to the Company generated for certain services rendered) for luxury suite rentals

and other related expenses at HSBC Arena in Buffalo, New York,
including tickets for the Company's employees to Buffalo Sabres games
and other related entertainment costs.

d.      From time to time the Company assists NFHLP in identifying providers of
programming carried on the Company's cable systems for NFHLP to
solicit in connection with the sale of advertising or promotional space in
the HSBC Arena.  The Company has not received any compensation for
this service.

e.      ACC Operations, Inc. ("ACC"), a wholly-owned subsidiary of the
Company, leases certain office space from NFHLP.  ACC does not pay
NFHLP rent.  In exchange for use of the premises, ACC completed
interior renovations of the premises.

183.    The Special Committee is investigating whether the foregoing arrangements, as
well as other payments made to NFHLP, were presented to or approved by the Board of Directors
or the independent directors of the Board of Directors, and if so approved, whether such approval
was based on accurate and complete information. The Special Committee is also investigating
whether the Company received fair value for payments it made pursuant to the foregoing
arrangements.

**G.      Certain Other Loans to and from Affiliates of the Rigas Family**

184.    During 2001 and possibly in prior periods, the Company advanced funds to
ErgoArts and Songcatcher Films on an unsecured basis.  At December 31, 2001, the outstanding
balances due to the Company from ErgoArts and Songcatcher Films under these arrangements

were approximately $677,000 and $3,077,000, respectively, which were the largest amounts of each such indebtedness outstanding during the year ended December 31, 2001.

185.    The advances to ErgoArts were made principally in connection with the development and potential production of documentary films.  The advances to Songcatcher Films were made in connection with the creation and production of the motion picture entitled "Songcatcher."  These transactions where not presented to or approved by the Board of Directors or the independent directors of the Board of Directors.

186.    Prior to May 24, 2002, the Company's loans to ErgoArts and Songcatcher Films had not been publicly disclosed by the Defendants.

**H.    Adelphia Business**

187.    Adelphia Business was a consolidated subsidiary of Adelphia until January 11, 2002, when it was spun off to Adelphia's stockholders.  Adelphia Business continues to be an affiliate of the Company because the Rigas Parties and Ellen Rigas Venetis own, directly or indirectly, approximately 17% of the common stock and approximately 53% of the voting interests in Adelphia Business.  The Rigas Parties are also executive officers and directors of Adelphia Business.

188.    At December 31, 2001, Adelphia Business and its subsidiaries owed the Company approximately $7.8 million for accounts payable to the Company and $19.2 million for accrued interest owing to the Company in connection with borrowings under the ABSO Loan.  In early 2002, the Company also advanced to Adelphia Business and its subsidiaries, including ABSO, approximately $36.8 million on an unsecured basis prior to the filing by Adelphia Business and certain of its subsidiaries, including ABSO, for bankruptcy protection.  From January 1, 2002

until the bankruptcy filings, Adelphia Business accumulated approximately $18,794,000 in accounts payable, and $15,600,000 in accrued interest owing to the Company in connection with the allocation of borrowings of $500,000,000 outstanding at December 31, 2001, under the ABSO Loan.

I.    **ML Media Recapitalization Agreement**

189.    On December 13, 2001, the Company reached a settlement of certain litigation relating to a joint venture with ML Media Partners, L.P. ("ML") and Arahavo's predecessor, Century Communications Corporation.  In connection with the settlement, the joint venture, ML, Century, and Highland Holdings entered into a recapitalization agreement (the "ML Media Recapitalization Agreement").

190.    Pursuant to the ML Media Recapitalization Agreement, the joint venture agreed to redeem the 50% joint venture interest of ML for a purchase price ranging from $275 million to $280 million, depending on the closing date.  Highland Holdings, which is a Rigas family general partnership, agreed to arrange debt financing for the joint venture in the amount required to effect the redemption and to fund certain capital expenditures.  The Company has agreed to guarantee this indebtedness.  The Company, the joint venture and Highland Holdings have also agreed that immediately after the closing, the joint venture will be recapitalized so that the Company has a 40% joint venture equity interest and Highland Holdings has a 60% joint venture equity interest, although the details and terms of such recapitalization have not yet been agreed to or completed. Pending the closing, all items of income, gain, loss and deduction for the joint venture operations are to be allocated to the Company, but the ML Recapitalization Agreement provides that the joint venture cannot make any distributions prior to closing.

191.    Upon consummation of this transaction, the Company, which previously owned a 50% interest in an unleveraged joint venture, will own a 40% interest in a leveraged joint venture.  In the event the redemption fails to occur for any reason, the Company has agreed to purchase ML's 50% joint venture interest on October 1, 2002 (or earlier if the closing is accelerated) under similar terms.  Highland Holdings has paid $10,000,000 into escrow, which will be forfeited to ML if the closing does not occur.  The Company's 50% joint venture interest has been pledged to ML as collateral for the Company's obligations.  In addition, the Company, Century and Highland are jointly and severally liable for the performance by the Company of its obligations.  If the closing does not occur by October 2, 2002 (or earlier if the closing is accelerated), ML will replace Century as the manager of the joint venture systems, will be entitled to management fees that are currently for the benefit of Century, and may pursue damages for breach, without any obligation to mitigate such damages. Although the Board of Directors approved the proposed acquisition by Highland Holdings of a 60% interest in the joint venture, the ML Media Recapitalization Agreement was not presented to the Board of Directors for approval and the Board of Directors did not approve of the Company incurring financial obligations as a result of this acquisition.

192.    The Defendants did not publicly disclose the ML Media Recapitalization Agreement, or any of its terms, until May 24, 2002, when it was disclosed in the Company's Form 8-K filing setting forth some of the numerous related party transactions between the Company and other Rigas family-controlled entities.

**J.    Praxis**

71

193.    Praxis Capital Ventures, L.P. ("Praxis") is an investment partnership which is a subsidiary of the Company.  Praxis Capital Partners, LLC ("Praxis Capital") is the general partner of Praxis.  Praxis Capital Management, LLC ("Praxis Management") is the management company of Praxis, which receives a management fee of approximately $1,307,000 annually.

194.    Defendant Venetis is the Managing Director of Praxis Capital, and owns a substantial majority of the membership interests in Praxis Capital.  Venetis, along with an investment committee comprised of himself, John Rigas and Timothy Rigas, control the investment decisions of Praxis.  Venetis also owns Praxis Management.

195.    In approximately June 2001, the Company signed a contract calling for the commitment of $65,000,000 of capital to Praxis.  Additionally, upon the formation of Praxis, the Company contributed preferred stock of a private company that it had previously purchased for $7,500,000.  The Company is required to make capital contributions upon the request of Praxis Capital when funds are necessary for investment purposes or for the management fee.

196.    As of May 2002, approximately $2.95 million of the Company's committed capital had actually been funded by the Company.  Praxis Capital has paid its proportionate share through an initial capital contribution at Praxis' inception and through subsequent capital contributions when called.  Praxis has made one investment to date in the amount of $1,000,000.  The remainder of the Company's capital contributions to Praxis have been used to pay approximately $1.96 million in management fees to Praxis Management

197.    Nothing about the formation or funding of Praxis, the Company's obligations to Praxis, or Venetis's interests in Praxis, Praxis Capital, and Praxis Management (other than his position as Managing Director of Praxis Capital) was publicly disclosed by the Company until

72

May 24, 2002, when the Special Committee announced that it was investigating the formation

and funding of Praxis, including matters relating to the approval thereof by the Board of

Directors.

**K.    The Golf Club**

198.    Until June 2002, the Golf Club at Wending Creek Farms, LLC (the "Golf Club"),

a wholly-owned subsidiary of the Company, was constructing a golf club and golf course on

approximately 830 acres of land near Coudersport, Pennsylvania, of which 535 acres are owned

by Wending Creek, 126 acres are owned by Wending 3656, and 169 acres are owned by a

wholly-owned subsidiary of the Company.  The Company expended approximately $13,000,000

on equipment and development costs for this project.  The Company did not execute any written

leases with respect to the land owned by Wending Creek and Wending 3656 and no lease

payments were charged to or paid by the Company to Wending Creek or Wending 3656 with

respect to the use of this land.  Upon information and belief, no documentation relating to the

arrangement between the Company and Wending Creek or Wending 3656 exists.  This

transaction was not presented to or approved by the Board of Directors or the independent

directors of the Board of Directors, and was not publicly disclosed by the Company until May 24,

2002, when the Special Committee announced it was investigating the transaction.  On June 14,

2002, the Company announced that it had ceased construction on this project.

**L.    The Timber Rights Transaction**

199.    In February 2000, ACC, a subsidiary of the Company, purchased timber rights

covering a twenty-year period from the date of closing, from an unaffiliated third party with

respect to 3656 acres of land located in Potter County, Pennsylvania, for a purchase price of

$26,535,070. At the end of the twenty-year period, the timber rights revert to the owner of the underlying land at such time.

200.    Also in February 2000, Wending 3656 purchased the underlying 3656 acres from the unaffiliated third party for a purchase price of $464,930. The timber purchase agreement provides that if a change in ownership of the Company occurs during the twenty-year period, then the timber rights would revert to Wending 3656 as part of the consideration received by Wending 3656 as a result of the change in ownership transaction. A change in ownership of the Company is defined to occur if the cumulative voting percentage of the Company stock held by John Rigas and the members of his immediate family falls below 50% of all outstanding voting shares.

201.    On May 24, 2002, and again on June 14, 2002, the Special Committee publicly stated that it was investigating whether or not the purchase price paid by the Company for these timber rights represents the fair market value of such rights based upon an independent third party appraisal. The Special Committee is also investigating whether the Company paid the purchase price for the underlying land on behalf of Wending 3656.

202.    Nothing about the purchase of the timber rights or of the underlying land was publicly disclosed by the Defendants prior to May 24, 2002, nor were these transactions presented to or approved by the Board or the independent directors of Adelphia.

**M.    Loans to Brown and Other Company Employees**

203.    On June 14, 2002, the Company disclosed for the first time that it had approximately $1.9 million in loans outstanding to current and former employees of the Company, and that the Company has taken a reserve of approximately $500,000 against non-

payment of these loans. The Company also disclosed that the Special Committee had identified four employees of Adelphia and four employees of Adelphia Business for whom the Company had guaranteed, either in whole or in part, loans from Citizens Trust Company. The identities of these employees have not been publicly disclosed. As of May 31, 2002, the aggregate outstanding amount of those guarantees was approximately $278,000.

204.    Defendant Brown received a loan from the Company in the aggregate principal amount of $700,000.

205.    The foregoing loans were not publicly disclosed by the Defendants prior to 2002.

**N.    Other Matters Under Investigation by the Special Committee**

206.    On May 24, 2002, the Special Committee also announced that it is investigating the following matters and transactions, none of which had been publicly disclosed by the Defendants before that date:

     a.    **Use of Company Aircraft.** The Rigas Parties, Ellen Rigas Venetis, and the entities they control, used Company aircraft for reasons unrelated to the business or operations of the Company or any of its subsidiaries. The Company has never been reimbursed for this use.

     b.    **Preston Motors.** Preston Motors is a car dealership that sold approximately 50 motor vehicles to the Company during the year ended December 31, 2001. John Rigas has a material beneficial interest in Preston Motors. The Special Committee is investigating this relationship.

     c.    **Condominium Acquisition and Maintenance.** The Special Committee is investigating whether Company funds and resources were used to

construct, acquire or maintain condominiums in Beaver Creek, Colorado, and Cancun, Mexico, for use exclusively or primarily by members of the Rigas family as opposed to Company personnel.

d.    **New York Apartment Use.**  The Company owns two apartments in New York City.  Since some time in 1998, Ellen Rigas Venetis and Peter L. Venetis have had exclusive use of these apartments on a rent free basis. The Special Committee is investigating this matter.

e.    **FPL Group, Inc. Note.**  Prior to October 1, 1999, Olympus Communications, L.P. ("Olympus") was a joint venture limited partnership between the Company and subsidiaries of FPL Group, Inc. ("FPL Group").  On October 1, 1999, Olympus transferred all of the outstanding common stock of its wholly-owned subsidiary, West Boca Security, Inc. ("WB Security"), to FPL Group in exchange for FPL Group's interest in the joint venture.  The only asset of WB Security was a $108,000,000 term note receivable from Ft. Myers Acquisition Limited Partnership, a wholly-owned subsidiary of Olympus.  FPL Group has demanded that the term note be paid in full on July 1, 2002.  The principal and accrued interest on that date will be approximately $127,400,000.  The note is purportedly secured by a pledge of FPL Group's interest in the joint venture.  Upon an event of default (including a failure of Olympus to prepay the note if and when required), that joint venture interest may

revert to FPL Group.  On May 15, 2002, Olympus missed an interest payment on its senior debt securities.

f.    **Certain Company Employees.**  On May 24, 2002, the Special Committee announced that it was investigating whether certain Company employees provided services for Rigas family members and/or the entities they control, at the cost of the Company.  On June 14, 2002, the Company disclosed that it had identified seven employees on Adelphia's payroll whose primary function was to provide services to the members of the Rigas family.

g.    **Briar's Creek Golf Club.**  On October 30, 2000, ACC (a subsidiary of the Company) purchased a membership interest in Briar's Creek Golf, LLC for $700,000.  This amount was paid by the Company through the Adelphia CMS.  The Special Committee is investigating whether the membership interests was purchased for business purposes or for personal use by members of the Rigas family.  The transaction was not presented to or approved by the Board.

## RESPONSIBILITIES OF THE AUDIT COMMITTEE

207.    On and before March 31, 2001, the Audit Committee of Adelphia's Board consisted of defendants Metros and Timothy Rigas.  From April 1, 2001 through June 12, 2001, the Audit Committee consisted of Metros, Timothy Rigas, Coyle, and Kailbourne.  As of June 13, 2001, the Audit Committee consisted of defendants Metros, Kailbourne and Coyle.

208.     On June 12, 2000, Adelphia's Board adopted a charter for the Audit Committee, which provided that the committee's primary responsibilities including "monitor[ing] the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting, and legal compliance," and "monitor[ing] the independence and performance of the Company's independent auditors and internal auditing department. The charter stated that the Audit Committee had "direct access to the independent auditors as well as anyone in the organization." The charter required that all members of the committee "have a basic understanding of finance and accounting and be able to read and understand fundamental financial statements, and [that] at least one member of the Committee shall have accounting or related financial management expertise." According to the charter, the Audit Committee's specific responsibilities include:  (a) reviewing the Company's annual audited financial statements prior to filing and distribution, which review should include discussion with management and independent auditors; (b) reviewing the Company's quarterly financial results with financial management and the independent auditors prior to the release of those results; (c) reviewing the independent auditors' audit plan and discussing its scope, staffing, reliance on management, and internal audit and general audit approach; and (d) reviewing and following up on significant reports prepared by the internal audit department together with management's response. A copy of this charter was attached as Exhibit B to the Company's proxy statement dated August 7, 2001.

209.     The Audit Committee was intimately involved with and controlled the Company's accounting and its financial reporting, and knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false. For example, the

78

Audit Committee members knew, or should have known, that Adelphia was jointly and severally liable for material amounts of borrowings by the Managed Entities under the co-borrowing agreements, and that those borrowings should have been, but were not, included as debts on Adelphia's balance sheet.

210.    If the Audit Committee had fulfilled its responsibilities, it would have detected the weaknesses in the Company's internal controls and the accounting improprieties that led to the omission of the Managed Entities' borrowings from the Company's balance sheets, and would have acted to ensure that the Company's financial condition was accurately reported.

### DEFENDANTS' VIOLATIONS OF GAAP AND SEC REGULATIONS

211.    The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).  In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (October. 15, 1970).  The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (November. 19, 1981).

212.    In Securities Act Release No. 6349 (September 8, 1981), the SEC stated:

> [I]t is the responsibility of management to identify
> and address those key variables and other

> qualitative and quantitative factors which are
> peculiar to and necessary for an understanding and
> evaluation of the individual company.

213.    In Accounting Series Release 173, the SEC reiterated the duty of management to

present a true representation of a company's operations:

> [I]t is important that the overall impression created
> by the financial statements be consistent with the
> business realities of the company's financial
> position and operations.

214.    Under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange

Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any

known demands, commitments, events or uncertainties" that are reasonably likely to have a

material impact on a company's sales revenues, income or liquidity, or cause previously reported

financial information not to be indicative of future operating results.  17 C.F.R. § 229.303(a)(l)-

(3) and Instruction 3.

215.    SEC Regulation S-X requires that financial statements filed with the SEC

conform with GAAP.  Financial statements filed with the SEC which are not prepared in

conformity with GAAP are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1).

216.    Adelphia's financial statements for the years 1999 and 2000 (including the related

quarterly periods) and for the first three quarters of 2001, and Arahova's financial statements for

the year ended December 31, 2000, and the quarters ended June 30, 2000, September 30, 2000,

March 31, 2001, June 30, 2001, and September 30, 2001, violated SEC Regulations and GAAP,

in that they failed to (i) disclose facts necessary to present a fair and truthful representation of

those companies' financial position and operations, (ii) provide those disclosures which were

required by GAAP, and (iii) identify and address those key variables and other qualitative and

quantitative factors which were peculiar to and necessary for an understanding and evaluation of the companies. Consequently, the overall impression created by the financial statements was not consistent with the business realities of the companies' reported financial position and operations.

217.    The financial statements that were issued by Adelphia for the years 1999 and 2000 (including the related quarterly periods) and for the first three quarters of 2001, and the financial statements issued by Arahova for the year ended December 31, 2000, and the quarters ended June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, and September 30, 2001, did not fairly and accurately represent the Company's financial position and operations. Among other reasons, they violated the following principles of GAAP:

a)    that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Financial Accounting Standards Board Statements ("FASB") Statement of Concepts No. 1, ¶ 40);

b)    that financial reporting should disclose the nature and amount of loss contingencies, including guarantees of the indebtedness of others, whether direct or indirect (FASB No. 5, Accounting for Contingencies; and Financial Accounting Standards Board Interpretation No. 34);

c)    that financial reporting should include disclosure of the terms, nature, and maximum amount of off-balance sheet risks associated with financial guarantees (FASB No. 105, "Disclosure of Information about Financial Instruments with Off-Balance Sheet Risk and Financial Instruments with Concentrations of Credit Risk," applicable to periods prior to June 15, 2000);

d)    that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

e)      that financial reporting should disclose the "fair value" of financial instruments such as guarantees, whether on or off balance sheet (or if the fair value cannot be determined, that fact should be disclosed) (FASB No. 107, "Disclosure of Fair Value of Financial Instruments");

f)      that financial reporting should disclose material related party transactions, such as transactions between a company "and its principal owners, management, or members of their immediate families," and including guarantees  (FASB No. 57, "Related Party Disclosures");

g)      that the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (FASB Statement of Concepts No. 6, ¶ 145);

h)      that revenues and gains generally should not be recognized until realized or  realizable, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (Statement Of Financial Accounting Concepts No. 5, Paragraph 83);

i)      that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it -- to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

j)      that financial reporting should provide information about an enterprise's financial performance during a certain time period (FASB Statement of Concepts No. 1, ¶ 42);

k)      that financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

l)      that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 80); and

m)      that conservatism be used as a prudent reaction in uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

218.    As independent auditor of both Adelphia and Arahova, Deloitte was responsible for reviewing those companies' accounting practices and providing an opinion as to whether those practices and the companies' financial statements comply with GAAP.  In conducting its audits, Deloitte failed to recognize and/or report the misrepresentations and omissions in Adelphia's and Arahova's financial statements, and issued unqualified audit opinions on the annual financial statements of Arahova for 2000 and of Adelphia for 1999 and 2000, falsely certifying their compliance with GAAP.

219.    In sum, Adelphia and Arahova materially understated their liabilities and overstated their stockholders' equity, and Adelphia materially overstated its revenues, in financial statements which were disseminated to the investing public, in a manner which violated GAAP, SEC regulations, and principles of fair reporting.  Because Deloitte failed to detect, report and/or correct these violations, the Prospectuses, the Registration Statement, and the other SEC filings and public statements containing financial information of Adelphia and Arahova were materially false and misleading and failed to disclose the true financial status of those companies.

## DELOITTE'S VIOLATIONS OF GAAS

220.    As the independent auditors of Adelphia and Arahova, Deloitte assisted in the preparation of their annual and quarterly financial statements, reviewed the quarterly financial statements and the text that accompanied them in the companies' Form 10-Qs, and audited the annual financial statements and the text that accompanied them in the companies' Form 10-Ks. Deloitte was also responsible for, among other things, examining Adelphia's and Arahova's systems of internal controls to identify (and report to management and the Audit Committee) any

material weaknesses or reportable conditions which might impact the accuracy or reliability of their financial statements.

221.    Deloitte was required to perform its audit services according to GAAS, which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue an unqualified opinion only if the Company's financial statements were fairly presented in accordance with GAAP.

222.    Deloitte issued unqualified audit opinions on Adelphia's annual financial statements for the years ending December 31, 1999 and December 31, 2000, and on Arahova's annual financial statements for the year ended December 31, 2000, stating that Deloitte's audits were conducted in accordance with GAAS and that, in Deloitte's opinion, the financial statements "present[ed] fairly, in all material respects" Adelphia's and Arahova's financial positions, results of operations, and cash flows for those years in accordance with GAAP. However, as alleged herein, Deloitte's audit opinions were materially false and misleading, and Deloitte's audits represented an extreme departure from GAAS. In addition, as alleged herein, the manner in which Adelphia's and Arahova's financial results were reported as part of the Company's financial statements represented an extreme departure from GAAP.

223.    Deloitte conducted audit examinations and participated in investigations of the business, operations, financial, accounting and management control systems of Adelphia and Arahova. Had Deloitte conducted its audits in accordance with GAAS, it would have discovered the omission of material amounts of debt from the companies' balance sheets, and would have discovered that the companies' financial statements were not prepared in accordance with GAAP. Deloitte should have been alerted to its obligations under GAAS pronouncements

detailed below to further examine the financial statements and determine the extent of any errors or irregularities.

224. As a result of its longstanding relationship with Adelphia which dated back to at least 1994, and the nature of the accounting and auditing services rendered to Adelphia and Arahova, Deloitte personnel were regularly present at Adelphia's corporate headquarters (which was also Arahova's headquarters) throughout the year and had continual access to and knowledge of Adelphia's and Arahova's private and confidential corporate, financial and business information, including internal monthly financial records, Board minutes and other internal memoranda, and thus were, or should have been, aware of the true facts as alleged herein concerning the true nature of Adelphia's and Arahova's financial condition. Deloitte therefore knew or should have known the adverse facts that rendered the Company's reported financial results, and Deloitte's unqualified opinion thereon, materially false and misleading.

225. For example, Deloitte knew or should have known that the Managed Entities had borrowed material amounts under the co-borrowing agreements, that subsidiaries of Adelphia and Arahova were jointly and severally liable for those borrowings, and that those borrowings should have been (but were not) included on Adelphia's and Arahova's balance sheets. Deloitte also knew or should have known that the Company's accounting with respect to its marketing support agreements, financial instruments from interactive cable service providers, payments from programming providers, capitalization of labor expenses, related party transactions, deferred billing arrangements, transfer of digital converter boxes, and capital spending amounts, was not in accordance with GAAP, and that the Company's revenue and EBITDA were overstated as a result.

226.   Nonetheless, Deloitte issued unqualified audit opinions on Adelphia's and Arahova's annual financial statements, in which it stated that the financial statements were presented in conformity with GAAP and that Deloitte's audits were performed in accordance with GAAS.

227.   GAAS requires that an auditor exercise due professional care in performing an audit and in preparing the audit report.  GAAS also requires that each audit be planned and performed with an attitude of professional skepticism.

228.   Deloitte failed to exercise due professional care in the performance of its audit of Adelphia's and Arahova's financial statements.  Among other ways, Deloitte failed to adhere to professional standards by: inadequately planning its audit; failing to understand Adelphia's and Arahova's internal control structures sufficiently; failing to obtain sufficient competent evidential matter; and improperly issuing unqualified audit reports.

### Deloitte Failed to Plan its Audit Adequately

229.   GAAS provides that an audit is to be adequately planned (AU 311).  Audit planning involves developing an overall strategy for the expected conduct and the scope of the audit.  In planning an audit, the auditor must obtain knowledge of the matters which relate to the nature of the entity's business, its organization, and operating characteristics.  The auditor is required to design the audit with professional skepticism (AU 316.27) in order to provide reasonable assurance of detecting errors and irregularities (AU 311.03), material misstatements (AU 312) or fraud (AU 316).  The auditor also must design the audit plan to account for the possibility that an entity may be unable to continue as a going concern (AU 341).

230.     Deloitte failed to comply with GAAS because it failed to design its audit plan to provide reasonable assurance of detecting material error as required by Statement of Auditing Standards No.82, *The Auditor's Responsibility to Detect and Report Errors and Irregularities* (AU 316A).

231.     Deloitte was required under GAAS to obtain knowledge of Adelphia's and Arahova's businesses, and apply analytical procedures in planning for its audit.  In the course of performing such procedures, Deloitte knew, or should have known, that Adelphia, Arahova, and their subsidiaries were controlled by the Rigas family, and had engaged in transactions with entities owned by the Rigas family, including the co-borrowing arrangements.  Despite these obvious issues, Deloitte failed to develop an adequate strategy for the conduct and scope of the audit of those transactions.

232.     In developing its audit plan, GAAS required Deloitte to consider the "audit risk" that Deloitte might fail to recognize that the companies' financial statements were materially misstated as a result of errors or irregularities.  (AU 312.02).  Deloitte either: (1) failed to plan and implement an adequate audit that took into account the audit risks, or (2) if it had an adequate audit plan it failed to follow it, or (3) if it had an adequate plan and followed it, Deloitte ignored the results of its findings and issued its unqualified opinions anyway.

### Deloitte Failed to Understand Adelphia's and Arahova's Internal Control Structure Sufficiently

233.     GAAS Standard of Field Work No. 2 requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance on those controls is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.  A company's internal

control structure consists of policies and procedures established by the company to provide reasonable assurance that its objectives will be achieved.  The auditor must focus on the substance of management's policies and procedures, not their form, because management may establish appropriate policies and procedures but not act on them.

234.    An auditor must perform procedures to obtain a sufficient understanding of the three elements of a company's internal control structure: the control environment, the accounting system, and control procedures.  The control environment, which includes management's integrity and ethical values, is the foundation of internal control and sets the tone of the organization.  The auditor must assess control risk -- the risk that a material misstatement contained in the company's financial statements will not be detected and prevented on a timely basis by the company's internal control structure policies.  Indeed, the ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.

235.    In the course of auditing Adelphia's and Arahova's financial statements, Deloitte knew or should have known facts which demonstrated that it had failed to sufficiently understand Adelphia's and Arahova's internal control structure and control risk.

236.    Despite this, Deloitte failed to expand the scope of its procedures adequately, and as a result, issued unqualified audit opinions on Adelphia's and Arahova's financial statements when such statements materially understated those companies' liabilities.

**Deloitte Failed to Obtain Sufficient Competent Evidential Matter**

237.    GAAS provides that accounting data alone is insufficient to support an opinion on financial statements.  (SAS Nos. 31 and 48, AU 326.16, SAS No. 1 Standard of Field Work).

Before rendering an opinion on financial statements, the auditor must obtain sufficient, competent "evidential matter" to afford a reasonable basis for the opinion. (AU 326) "Evidential matter" consists of the underlying accounting data and all corroborating information available to the auditor. (AU Section 326.15.) Corroborating evidential matter includes both documentation obtained during the field work (e.g., checks, invoices, contracts, and independent confirmations) and information obtained from inquiry, observation, inspection and physical examination. (AU Section 326.17.)

238.    Management's representations are not a valid substitute for the application of audit procedures to form a reasonable basis for an auditor's opinion of financial statements (SAS No. 19). An auditor must establish and perform a confirmation process with third parties to verify information utilized in the audit models (SAS No. 67). Where a random sampling audit reveals material discrepancies or errors, the audit procedures should be expanded to determine the magnitude of such errors, or the auditors should consider alternative procedures that would provide sufficient evidence to form a conclusion pursuant to Financial Accounting Standards Board Statement on Accounting Standards 31, 39.

239.    In the course of auditing Adelphia's and Arahova's financial statements, Deloitte either knew or should have known facts which indicated that it had failed to obtain sufficient competent evidential matter to afford a reasonable basis in opining on the financial statements. Deloitte's staff was frequently present at Adelphia's and Arahova's corporate headquarters and had access to their internal corporate books and records. In addition, Deloitte's staff had access to Adelphia's and Arahova's private and confidential financial and business information. Despite the availability of such records and information, Deloitte failed to obtain, through

inspection, observations, inquiries, confirmations and other audit procedures, sufficient

competent evidential matter to afford a reasonable basis for its opinions on Adelphia's and

Arahova's financial statements.  As a result, Deloitte issued unqualified opinions on Adelphia's

financial statements for 1999 and 2000, and on Arahova's financial statements for 2000, when

such financial statements materially understated those companies' liabilities.

### Deloitte Improperly Issued Unqualified Audit Reports

240.    The Standards of Reporting under GAAS (SAS No.1, AU 150.02) provide the

following:

> (1)    The report shall state whether the financial statements are presented in
> accordance with generally accepted accounting principles.

> (2)    The report shall identify those circumstances in which such principles
> have not been consistently observed in the current period in relation to the
> preceding period.

> (3)    Informative disclosures in the financial statements are to be regarded as
> reasonably adequate unless otherwise stated in the report.

> (4)    The report shall either contain an expression of opinion regarding the
> financial statements, taken as a whole, or an assertion to the effect that an
> opinion cannot be expressed. When an overall opinion cannot be
> expressed, the reasons therefor should be stated. In all cases, where an
> auditor's name is associated with financial statements, the report should
> contain a clear-cut indication of the character of the auditor's work, if any,
> and the degree of responsibility the auditor is taking.

241.    Deloitte issued unqualified audit opinions on Adelphia's financial statements for

1999 and 2000, and on Arahova's financial statements for 2000, falsely stating that those

financial statements had been prepared in accordance with GAAP.

### Deloitte Failed To Evaluate Whether There Was Substantial
### Doubt About Adelphia's Ability To Continue As A Going Concern

242.    Standards under GAAS require an auditor to evaluate whether "there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time not to exceed one year beyond the date of the financial statements being audited."  (AU 341.02).

243.    Although there is a presumption of continuation of an entity as a going concern, "information that significantly contradicts the going concern assumption relates to the entity's inability to continue to meet its obligations as they come due without a substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions."  (SAS 59, 64 and 77, AU 341.01).

244.    Less than three months after the disclosure of Adelphia's off-balance sheet debt, the Company defaulted on bank loans and interest payments on its debt securities and filed for bankruptcy protection under Chapter 11.

245.    Deloitte failed to properly evaluate Adelphia's ability to continue as a going concern when auditing Adelphia's financial statements.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS
### PROXIMATELY CAUSED PLAINTIFF'S DAMAGES

246.    No market would have existed for the Bonds absent the materially false and misleading statements and omissions alleged herein.  If the truth about Adelphia's and Arahova's financial condition had been known to LACERA and/or its agents, they would not have purchased the Bonds.

247.    At the times the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents had knowledge of the wrongful conduct alleged herein, or of the

information misrepresented or withheld by Defendants, and it could not reasonably have discovered such information.

## COUNT I

**Violation of Section 11 of the Securities Act,
Against Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas,
Dennis Coyle, Pete Metros, Banc of America, Salomon, and Deloitte**

248.     LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein, except LACERA specifically excludes any allegations of fraudulent intent or scienter.

249.     This Count is brought pursuant to Section 11(a) of the Securities Act, 15 U.S.C. §77l(a)(2), against Defendants John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Dennis Coyle, Pete Metros, Banc of America, Salomon, and Deloitte.

250.     The November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds were offered for sale, and sold, by means of prospectus supplements.  By their terms, and pursuant to SEC Rule 430A, 17 C.F.R. § 230.430A, each of these prospectus supplements constituted part of a Registration Statement on Form S-3.  Thus, the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds were offered for sale and sold through a Registration Statement.

251.     The Prospectuses and Registration Statement were issued by Adelphia.  The Registration Statement was signed by John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Dennis Coyle, and Pete Metros.  Salomon prepared and disseminated each of the Prospectuses, and Banc of America prepared and disseminated the 2010 Prospectus and the 2011 Prospectus. (LACERA asserts no Section 11(a) claim against Banc of America with respect to the November 2009 Prospectus.)   Deloitte's audit opinions on Adelphia's 1999 and 2000 annual financial

statements were incorporated by reference in the Prospectuses, and thereby in the Registration Statement, with Deloitte's knowledge and consent.

252.    The Prospectuses, each constituting part of a Registration Statement, contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the Prospectuses not misleading.  For example, each of the Prospectuses contained (and incorporated by reference) balance sheets and descriptions of Adelphia's debts which did not include the Managed Entities' borrowings under the co-borrowing agreements, and therefore materially understated Adelphia's liabilities.  Each of the Prospectuses also incorporated by reference Deloitte's unqualified audit opinions, which were materially false and/or misleading.

253.    LACERA and/or its agents purchased November 2009 Bonds, 2010 Bonds, and 2011 Bonds after the effective date of the Registration Statement, which are traceable to the false and misleading Registration Statement.

254.    Defendants John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Dennis Coyle, and Pete Metros were negligent in that they failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the Prospectuses (and therefore in the Registration Statement).

255.    Defendant Banc of America was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the 2010 Prospectus and the 2011 Prospectus (each of which constituted part of the Registration Statement).  In particular, as a co-lead arranger and/or lender (or an affiliate thereof) under four co-borrowing facilities between Adelphia subsidiaries and Managed Entities, Banc of America

knew or should have known about the billions of dollars in borrowings that had been drawn upon those facilities by Managed Entities, and that those borrowings (for which Adelphia was jointly and severally liable) were not disclosed in Adelphia's Registration Statement, or the amendments thereto, and further that the statements in the Registration Statement and the amendments thereto regarding the amount of Adelphia's debt were materially false and misleading. Banc of America also knew or should have known this information due to its engagement by the Company since at least January 2001 to manage certain of the Company's disposition activities and to advise the Company on capital funding matters. By virtue of that engagement, Banc of America was intimately familiar with the Company's debt obligations.

256.    Defendant Salomon was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the Prospectuses (each of which constituted part of the Registration Statement). In particular, as a managing agent and/or lender (or an affiliate thereof) under three of the co-borrowing facilities between Adelphia subsidiaries and Managed Entities, Salomon knew or should have known about the billions of dollars in borrowings that had been drawn upon those facilities by Managed Entities, and that those borrowings (for which Adelphia was jointly and severally liable) were not disclosed in Adelphia's Registration Statement, or the amendments thereto, and further that the statements in the Registration Statement and the amendments thereto regarding the amount of Adelphia's debt were materially false and misleading. Salomon also knew or should have known this information due to its engagement by the Company since at least January 2001 to manage certain of the Company's disposition activities and to advise the Company on capital funding matters. By virtue of that engagement, Salomon was intimately familiar with the Company's debt obligations.

257.    Deloitte was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in Adelphia's 1999 and 2000 annual financial statements, and in Deloitte's audit opinions thereon, all of which were incorporated by reference into the Registration Statement, and the amendments thereto, with the knowledge and consent of Deloitte.

258.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions.

259.    LACERA suffered injury as a result of the actions alleged herein.

260.    LACERA hereby tenders its November 2009 Bonds, 2010 Bonds and 2011 Bonds to Defendants and seeks rescission of their purchases to the extent that it continues to own such securities.

## COUNT II

**Violation of Section 12(a)(2) of the Securities Act, Against
Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis**

261.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein, except LACERA specifically excludes any allegations of fraudulent intent or scienter.

262.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis.

263.    The November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds were offered for sale, and sold, by means of Section 10 Prospectuses.

264.    The Prospectuses contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the Prospectuses not misleading.  For example, each of the Prospectuses contained (and incorporated by reference) balance sheets and descriptions of Adelphia's debts which did not include the Managed Entities' borrowings under the co-borrowing agreements, and therefore materially understated Adelphia's liabilities.

265.    Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis solicited LACERA to purchase the Bonds.  Their actions of solicitation included participating in the preparation and distribution of the false and misleading Prospectuses.

266.    In soliciting the purchase of the Bonds, these defendants were motivated by their own financial interests.

267.    Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis were negligent in that they failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the Prospectuses.

268.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions.

269.    LACERA suffered injury as a result of the actions alleged herein.

270.    LACERA hereby tenders its November 2009 Bonds, 2010 Bonds and 2011 Bonds to Adelphia and seeks rescission of its purchases to the extent that it continues to own such securities.

## COUNT III

### Violation of Section 12(a)(2) of the Securities Act, Against Banc of America

271.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein, except LACERA specifically excludes any allegations of fraudulent intent or scienter.

272.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against Defendant Banc of America.

273.    Defendant Banc of America offered to sell, and did sell, the 2010 Bonds and the 2011 Bonds by means of Section 10 prospectuses.

274.    Each of the Prospectuses contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the prospectuses not misleading.  For example, each of the Prospectuses contained (and incorporated by reference) balance sheets and descriptions of Adelphia's debts which did not include the Managed Entities' borrowings under the co-borrowing agreements, and therefore materially understated Adelphia's liabilities.

275.    Defendant Banc of America solicited LACERA to purchase the 2010 Bonds and the 2011 Bonds.  Its actions of solicitation included preparation and distribution of the false and misleading prospectuses for those Bonds.

276.    In soliciting the purchase of these Bonds, defendant Banc of America was motivated by its own financial interests.

277.    Defendant Banc of America was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the 2010

Prospectus and the 2011 Prospectus.  In particular, as a co-lead arranger and/or lender (or an affiliate thereof) under four co-borrowing facilities between Adelphia subsidiaries and Managed Entities, Banc of America knew or should have known about the billions of dollars in borrowings that had been drawn upon those facilities by Managed Entities, and that those borrowings (for which Adelphia was jointly and severally liable) were not disclosed in Adelphia's prospectuses, and further that the prospectuses' statements regarding the amount of Adelphia's debt were materially false and misleading.  Banc of America also knew or should have known this information due to its engagement by the Company since at least January 2001 to manage certain of the Company's disposition activities and to advise the Company on capital funding matters.  By virtue of that engagement, Banc of America was intimately familiar with the Company's debt obligations.

278.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions.

279.    LACERA suffered injury as a result of the actions alleged herein.

280.    LACERA hereby tenders its 2010 Bonds and 2011 Bonds to Defendants and seeks rescission of its purchases to the extent that it continues to own such securities.

## COUNT IV

### Violation of Section 12(a)(2) of the Securities Act, Against Salomon

281.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein, except LACERA specifically excludes any allegations of fraudulent intent or scienter.

282.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against Defendant Salomon.

283.     Defendant Salomon offered to sell, and did sell, the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds by means of Section 10 prospectuses.

284.     Each of the Prospectuses contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the prospectuses not misleading.  For example, each of the Prospectuses contained (and incorporated by reference) balance sheets and descriptions of Adelphia's debts which did not include the Managed Entities' borrowings under the co-borrowing agreements, and therefore materially understated Adelphia's liabilities.

285.     Defendant Salomon solicited LACERA to purchase the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds.  Its actions of solicitation included preparation and distribution of the false and misleading Prospectuses for those Bonds.

286.     In soliciting the purchase of these Bonds, defendant Salomon was motivated by its own financial interests.

287.     Defendant Salomon was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the Prospectuses.  In particular, as a managing agent and/or lender (or an affiliate thereof) under three of the co-borrowing facilities between Adelphia subsidiaries and Managed Entities, Salomon knew or should have known about the billions of dollars in borrowings that had been drawn upon those facilities by Managed Entities, and that those borrowings (for which Adelphia was jointly and severally liable) were not disclosed in Adelphia's prospectuses, and further that the prospectuses'

statements regarding the amount of Adelphia's debt were materially false and misleading. Salomon also knew or should have known this information due to its engagement by the Company since at least January 2001 to manage certain of the Company's disposition activities and to advise the Company on capital funding matters.   By virtue of that engagement, Salomon was intimately familiar with the Company's debt obligations.

288.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions.

289.    LACERA suffered injury as a result of the actions alleged herein.

290.    LACERA hereby tenders its November 2009 Bonds, 2010 Bonds, and 2011 Bonds to Defendants and seeks rescission of its purchases to the extent that it continues to own such securities.

## COUNT V

**Violation of Section 15 of the Securities Act, Against Defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne**

291.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 and Counts I and II above as if fully set forth herein.

292.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne.

293.    Adelphia committed primary violations of Sections 11(a) and 12(a)(2) of the Securities Act by soliciting LACERA to purchase the November 2009 Bonds, 2010 Bonds, and

2011 Bonds and by selling those Bonds by means of materially false, misleading, and incomplete Registration Statements and Prospectuses (as described herein).  Adelphia's actions of solicitation included substantial participation in the preparation and distribution of the false and misleading Prospectuses and Registration Statement (and amendments thereto).

294.    In soliciting the purchase of the Bonds, Adelphia was motivated by its own financial interests.

295.    Adelphia was negligent in that it failed to exercise reasonable care in ensuring that the statements in the Prospectuses and the Registration Statement, and the amendments thereto, were accurate and complete.

296.    Each of defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne controlled Adelphia within the meaning of Section 15 of the Securities Act.

297.    Defendants James Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis were directors and senior executive officers of Adelphia.  Together, they held voting control of the Company and constituted a majority of Adelphia's Board of Directors.  Defendant Brown was a senior executive in Adelphia's finance department, who had authority to (and did) negotiate and execute co-borrowing agreements and other financial documents on the Company's behalf, and who was knowledgeable about the Company's debt levels and credit facilities.  Defendants Coyle, Gelber, Metros, and Kailbourne were directors of Adelphia, and defendants Metros, Coyle and Kailbourne were members of the Audit Committee at various times.

298.    By virtue of their high level positions with Adelphia, their participation in and/or awareness of Adelphia's finances and operations, their participation on the Audit Committee

and/or Compensation Committee, and/or their intimate knowledge of the materially false, misleading, and incomplete statements which were disseminated to LACERA and its agents as part of the Prospectuses, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making process of Adelphia, including the content and dissemination of the Prospectuses and other public statements which were false and misleading.  These Defendants were provided with, or had unlimited access to, the Prospectuses and other statements that were false and misleading prior to and/or shortly after they were issued or publicly disseminated, and had the ability to prevent their issuance or public dissemination, or cause the misstatements and omissions to be corrected, but failed to do so.

299.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions.

300.    As a direct and proximate result of the wrongful conduct of Adelphia, LACERA suffered damages.

301.    By virtue of their positions as controlling persons of Adelphia, defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne.are liable pursuant to Section 15(a) of the Securities Act.

## COUNT VI

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Arising out of Statements Relating to the Financial Condition of Adelphia and its Subsidiaries) Against Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, Peter Venetis, and James R. Brown**

302.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

303.    This Count is brought pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, Venetis, and Brown.

304.    Adelphia's financial statements for the years 1999 and 2000 (including the related quarterly periods) and for the first three quarters of 2001, which were contained or incorporated by reference in the Registration Statement, the Prospectuses, and other public filings, including the Company's Forms 10-K and Forms 10-Q for the relevant periods, were all materially false and/or misleading when issued.   Among other reasons, they were materially false and misleading because they contained false statements of the Company's revenue and debt levels, and omitted material amounts of borrowings by the Managed Entities under the co-borrowing agreements for which the Company's subsidiaries were jointly and severally liable.

305.    Adelphia's Form 10-K filings for 1999 and 2000 were signed by, among others, defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Venetis.  Adelphia's Form 10-Q filings for each quarterly period in 1999 and 2000 and for the first three quarters of 2001 were signed by Timothy Rigas.

306.    At all relevant times, each of defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, Venetis, and Brown, knew or were reckless in not knowing (1) that the Managed

Entities had borrowed material amounts under the co-borrowing agreements, (2) that Adelphia's subsidiaries were jointly and severally liable for those borrowings, (3) that those borrowings were not included on Adelphia's balance sheet, (4) that the Company had engaged in a number of manipulative accounting practices whose purpose and effect was to inflate the Company's reported revenue and EBITDA figures, and (5) that the Company had fewer basic cable subscribers than it was reporting in its public statements.  Consequently, each of these defendants knew that Adelphia's financial statements for the years 1999 and 2000 (including the related quarterly periods) and for the first three quarters of 2001, which were contained or incorporated by reference in the Registration Statement, the Prospectuses and other public filings, including the Company's Forms 10-K and Forms 10-Q for the relevant periods, were all materially false and/or misleading.  Defendant Brown knew (or was reckless in not knowing) this information by virtue of his position as a senior executive in Adelphia's finance department, with intimate knowledge of the Company's credit facilities.  The Rigas Parties and Venetis knew (or were reckless in not knowing) this information by virtue of their positions as directors and senior executives of Adelphia, as well as their ownership and/or control of the Managed Entities.

307.    Each of defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, Venetis, and Brown, as senior officers and directors of Adelphia, had direct and supervisory involvement in and controlled the Company's day-to-day operations, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other public statements which were false and misleading.  These defendants were provided with or had unlimited access to the reports, press releases, public filings, financial

statements and other statements which were false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected. These defendants individually and collectively were responsible for, among other things, the Company's financial accounting system, the Company's system of internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of the Company and contained in reports and other documents, including those filed with the SEC. As alleged herein, those documents contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading.

308. Defendant Timothy Rigas served on the Audit Committee of the Board during the time period when the Company's 1999 and 2000 year-end audited financial statements were being prepared and published. As a member of the Audit Committee, he was intimately involved with and controlled the Company's accounting and its financial reporting. He was responsible for fully understanding the Company's accounting policies, procedures and internal control systems, and was, or should have been, in contact with the Company's auditors. He also had the authority and duty to oversee, review and examine statements made in the name of the Company contained in reports and other documents, including financial statements filed with the SEC, and to be certain that the Company's financial condition was reported in a fair and accurate manner. He knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false.

309.    Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, Peter Venetis, and Brown acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

310.    The Rigas Parties' and Venetis' scienter is evidenced by the fact that they (or in the case of Venetis, his wife) are significant securities holders of Adelphia whose financial interests would be severely damaged if the Company's true financial condition had been disclosed.  Particularly since the Company and its subsidiaries could not satisfy their ongoing capital needs through operations, it was critical that they maintain access to capital markets.  The financial performance of Adelphia and its subsidiaries, as perceived by analysts and investors, is what enabled it to sell equity and assume debt, and thus to continue its corporate existence.  Similarly, to avoid default on their numerous debt instruments and credit agreements, Adelphia had to maintain compliance with its debt covenants.  Failure to do so would have put the Company, and these defendants' livelihoods, at risk.  Thus, the Rigas Parties and Venetis had a motive to commit fraud in order to inflate the Company's financial results.  They also had an opportunity to do so by virtue of their positions with Adelphia and its subsidiaries.

311.    In addition, the Rigas Parties and Venetis (through his wife) benefited from the fraud, in that they owned and controlled the Managed Entities that were receiving the loans, and they used the proceeds of the Managed Entities' undisclosed borrowings for their own personal benefit, including to purchase additional Adelphia securities.  The Rigas Parties and Venetis (through his wife) also received personal financial benefits from a number of undisclosed transactions with the Company, many of which the Board never approved.  In essence, the Rigas

Parties and Venetis were using Adelphia as their own personal piggy bank, without regard for the interests of the other equity and debt holders.

312.    Brown's scienter is further evidenced by his receipt of a $700,000 loan from Adelphia, which provided him the motive to conceal the wrongdoing of the Rigas family (which controlled Adelphia).

313.    The materially false and misleading statements by these Defendants and the Company were made in connection with the purchases of the Bonds by LACERA and/or its agents.

314.    LACERA and/or its agents relied on the materially false and misleading statements of these Defendants and the Company in purchasing the Bonds. LACERA and/or its agents relied on the Company's public filings and press releases, including the Forms 10-K and 10-Q filings which contained the materially false and misleading financial statements, in deciding to purchase Bonds. LACERA and/or its agents also relied on the Prospectuses and the financial statements contained therein.

315.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and they relied upon the representations made by the Defendants and the Company.

316.    These materially false and misleading statements proximately caused LACERA and/or its agents to purchase the Bonds at an artificially high price, and thereby proximately caused LACERA to suffer damages.

317.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT VII

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Arising out of Statements Relating to Arahova's Financial Condition) Against Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas**

318.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

319.    This Count is brought pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas.

320.    Arahova's financial statements for the year 2000 and the quarters ended June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, and September 30, 2001, which were contained or incorporated by reference in the Company's Forms 10-K and Forms 10-Q for the relevant periods, were all materially false and/or misleading when issued.   Among other reasons, they were materially false and misleading because they contained false statements of the Arahova's debt levels, omitting material amounts of borrowings by the Managed Entities under the co-borrowing agreements for which a subsidiary of Arahova was jointly and severally liable.

321.    Arahova's Form 10-K filing for the year ended December 31, 2000 was signed by defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Venetis.  Arahova's Form 10-Q filings for the quarters ended June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, and September 30, 2001 were signed by Timothy Rigas.

322.    At all relevant times, each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas knew or were reckless in not knowing (1) that the Managed Entities had borrowed material amounts under the co-borrowing agreements, (2) that a subsidiary of Arahova was jointly and severally liable for those borrowings, and (3) that those borrowings were not included on Arahova's balance sheet.  Consequently, each of these defendants knew that Arahova's financial statements for the year 2000 and the quarters ended June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, and September 30, 2001, which were contained or incorporated by reference in the Company's Forms 10-K and Forms 10-Q for the relevant periods, were all materially false and/or misleading.  The Rigas Parties knew (or were reckless in not knowing) this information by virtue of their positions as directors and senior executives of Arahova and Adelphia (Arahova's parent company), as well as their ownership and/or control of the Managed Entities.  Adelphia knew this information as the parent company of Arahova.

323.    Each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas, as senior officers and directors of Arahova, had direct and supervisory involvement in and controlled Arahova's day-to-day operations, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of Arahova, including the content and dissemination of the financial statements, public filings and other public statements which were false and misleading.  These defendants were provided with or had unlimited access to the reports, press releases, public filings, financial statements and other statements which were false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public

dissemination or cause the statements to be corrected. These defendants individually and collectively were responsible for, among other things, Arahova's financial accounting system, Arahova's system of internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of Arahova and contained in reports and other documents, including those filed with the SEC. As alleged herein, those documents contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading.

324.    Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

325.    The Rigas Parties' scienter is further evidenced by the fact that they are significant securities holders of Adelphia whose financial interests would be severely damaged if the Company's true debt levels had been disclosed. Particularly since the Company and its subsidiaries (including Arahova) could not satisfy their ongoing capital needs through operations, it was critical that they maintain access to capital markets. The financial performance of Adelphia and its subsidiaries, as perceived by analysts and investors, is what enabled them to sell equity and assume debt, and thus to continue their corporate existence. Similarly, to avoid default on its numerous debt instruments and credit agreements, Arahova had to maintain compliance with its debt covenants. Failure to do so would have put Arahova, Adelphia, and these defendants' livelihoods, at risk. Thus, the Rigas Parties had a motive to commit fraud in order to inflate Arahova's financial results. They also had an opportunity to do so by virtue of their positions with Arahova.

326.    In addition, the Rigas Parties benefited from the fraud, in that they owned and controlled the Managed Entities that were receiving the loans, and they used the proceeds of the Managed Entities' undisclosed borrowings for their own personal benefit, including to purchase additional Adelphia securities.

327.    The materially false and misleading statements by Arahova and these Defendants were made in connection with the purchases of the 2003 Bonds and January 2008 by or on behalf of LACERA.

328.    LACERA and/or its agents relied on the materially false and misleading statements of Arahova and these Defendants in purchasing the 2003 Bonds and the January 2008 Bonds.  LACERA and/or its agents relied on Arahova's public filings and press releases, including the Forms 10-K and 10-Q filings which contained the materially false and misleading financial statements, in deciding to purchase these bonds.

329.    At the time the 2003 Bonds and the January 2008 Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and they relied upon the representations made by the Defendants and Arahova.

330.    These materially false and misleading statements proximately caused LACERA and/or its agents to purchase the 2003 Bonds and the January 2008 Bonds at an artificially high price, and thereby proximately caused LACERA to suffer damages.

331.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT VIII

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder, Against Deloitte

332.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

333.    This Count is brought pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Deloitte.

334.    As "independent" auditors of Adelphia and Arahova, Deloitte had a duty to examine those companies' financial statements in accordance with GAAS to determine, among other things, whether the financials were presented in accordance with GAAP.  Further, in connection therewith, Deloitte had a duty to disclose to management, and in particular the Audit Committee of Adelphia, any defects in the system of internal controls.

335.    As alleged herein, Adelphia's financial statements for the years 1999 and 2000 (and the related quarterly periods) and the first three quarters of 2001, and Arahova's financial statements for the year 2000 and the quarters ended June 30, 2000, September 30, 2000, March 31, 2001, June 30, 2001, and September 30, 2001, were materially false and misleading, in that they contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements in those documents not misleading.  These financial statements were contained or incorporated in the Registration Statement, Prospectuses, and other SEC filings and press releases of Adelphia and Arahova during the relevant periods.

336.    Deloitte's unqualified audit opinions with respect to Adelphia's 1999 and 2000 annual financial statements and Arahova's 2000 annual financial statements were materially false and misleading, in that they falsely represented that Deloitte had audited the financial statements

in accordance with GAAS and that the financial statements presented fairly, in all material respects, the companies' financial positions at each respective year-end in conformity with GAAP.

337.    Because Adelphia and Arahova were public companies, Deloitte knew and understood that its reports concerning their financial statements would be distributed to the investing public, and that investors would rely, and had a right to rely, on such reports.  Deloitte knew and understood that its audit opinions would be included in and constituted a material part of these companies' annual reports on Form 10-K filed with the SEC.  Deloitte consented to the inclusion of its audit opinions on Adelphia's 1999 and 2000 annual financial statements (which included statements that those financial statements were in compliance with GAAP) in the Prospectuses and Registration Statement, and the amendments thereto.  Deloitte understood that a primary intent of Adelphia and Arahova was for Deloitte's professional services to benefit or influence the persons to whom Adelphia and Arahova were directing their efforts to sell the Bonds.

338.    In auditing the financial statements of Adelphia and Arahova, Deloitte disregarded, in violation of GAAS, glaring irregularities in the companies' books and records and system of internal controls.  Deloitte falsely represented to investors that it had audited the financials in accordance with GAAS and that the financial statements were presented in accordance with GAAP when it issued its unqualified audit opinions.

339.    Deloitte's actions in disregarding these glaring irregularities, holding out to the public and the SEC that it had conducted the audits in accordance with GAAS, and certifying the

financial statements as prepared in accordance with GAAP, were intentional or, at a minimum, reckless.

340.    By virtue of its position as independent auditor of Adelphia since at least 1994, and of Arahova since at least 1995, Deloitte had access to key employees of these companies and continual access to and knowledge of their confidential corporate, financial, operating, and business information at all relevant times.  As a result of the auditing services it provided to Adelphia and Arahova, Deloitte's personnel were frequently present at Adelphia's corporate headquarters (which was also Arahova's headquarters) throughout each year.  Deloitte knew or recklessly disregarded Adelphia's and Arahova's true financial condition, and intentionally or recklessly failed to take steps which, as Adelphia's and Arahova's auditor, it could and should have taken to fully and fairly disclose the true facts to the public.

341.    At all relevant times, Deloitte made or caused to be made statements contained in reports and other documents Adelphia and Arahova filed with the SEC which were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts.  Deloitte falsely represented that it had audited the companies' financials in accordance with GAAS, when in fact its audits had not complied with GAAS.  Deloitte also falsely certified Adelphia's annual financial statements for the years ended December 31, 1999 and 2000, and Arahova's annual financial statements for the year ended December 31, 2000, as having been prepared in accordance with GAAP, when it knew or recklessly failed to know that these reports contained statements that were materially false and misleading.

342.    Deloitte either knew or recklessly disregarded facts which indicated that Adelphia's and Arahova's financial statements were materially false and misleading, and issued

114

unqualified audit opinions on Adelphia's annual financial statements for 1999 and 2000, and Arahova's annual financial statements for 2000, when such financial statements materially understated the companies' liabilities.

343.    Deloitte's scienter is further evidenced by the magnitude by which the financial results were misstated in its financial statements:  Adelphia's liabilities were understated by at least $3.1 billion, and Arahova's were understated by more than $1 billion.  Adelphia's revenues were overstated by approximately $500 million over two years.  Absent intentional or reckless conduct, Deloitte would have detected these misstatements during the course of their audits and either taken corrective action or declined to issue unqualified audit opinions.

344.    Deloitte also had motive and opportunity to commit the fraud alleged herein. Deloitte audited the financial statements and issued audit opinions which it knew would be disseminated to, and relied upon by, investors.  Thus it had the opportunity to commit fraud. Deloitte's motive derives from its longstanding relationship with Adelphia, including its service as Adelphia's auditor since at least 1994, and the fact that it might destroy that relationship, and the millions of dollars of fees derived therefrom, if it failed to issue unqualified opinions or if it otherwise blew the whistle on the fraud occurring at Adelphia.  In the year ended December 31, 2001, Deloitte received $1,319,000 in audit fees and $2,182,000 in non-audit fees from Adelphia.

345.    Deloitte acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

346.    The materially false and misleading statements by Deloitte were made in connection with the purchases of the Bonds by or on behalf of LACERA.

347.    LACERA and/or its agents relied on the materially false and misleading statements in purchasing the Bonds. LACERA and/or its agents relied on Adelphia's public filings, including the financial statements contained or incorporated in its Registration Statement, Prospectuses and Form 10-K filings and Deloitte's audit opinions contained therein, in deciding to purchase the Bonds. LACERA and/or its agents also relied on Arahova's public filings, including the financial statements contained in its Form 10-K filings and Deloitte's audit opinions contained therein, in deciding to purchase the 2003 Bonds and the January 2008 Bonds.

348.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and they relied upon the representations made by Deloitte.

349.    These materially false and misleading statements proximately caused LACERA and/or its agents to purchase the Bonds at an artificially high price, and thereby proximately caused LACERA to suffer damages.

350.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT IX

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder, Against Banc of America and Salomon

351.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

352.    This Count is brought pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Salomon (with respect to purchases of the November

2009 Bonds, the 2010 Bonds and the 2011 Bonds) and against Banc of America (with respect to purchases of the 2010 Bonds and the 2011 Bonds).

353.    As alleged herein, the Registration Statement (and the amendments thereto) and each of the Prospectuses were materially false and misleading because, among other things, they failed to disclose the amount of the Managed Entities' borrowings under the co-borrowing agreements with Adelphia's subsidiaries (thereby understating the amount of the Company's consolidated debt), and overstated the Company's revenue and EBITDA.

354.    Banc of America and Salomon each had the obligation as a lead underwriter for Adelphia securities to perform adequate due diligence in order to assure themselves that the information in the Prospectuses and Registration Statement was true and accurate.  Had they fulfilled their obligation to perform adequate due diligence, Banc of America and Salomon would have known that information in the Registration Statement (and the amendments thereto) and Prospectuses was, in material respects, false and misleading.

355.    Banc of America and Salomon knew, or should have known, that LACERA and its agents were relying on them to perform the required due diligence.

356.    Banc of America and Salomon intentionally, or at least recklessly, failed to fulfill their due diligence obligations.  They either knew about the material misstatements and omissions in the Registration Statement and Prospectuses but failed to disclose them, or they failed to do even the most basic due diligence and recklessly failed to discover these misstatements and omissions.

357.    In addition to serving as lead underwriters for Adelphia's bond offerings, each of Banc of America and Salomon (and/or their affiliates) was a lender to Adelphia and its

subsidiaries, including under co-borrowing agreements between Adelphia's subsidiaries and Managed Entities. In addition, each of Banc of America and Salomon provided financial advisory services to the Company. At all relevant times, Adelphia was a major clients of each of Salomon and Banc of America. Salomon and Banc of America were each paid millions of dollars for their underwriting and financial advisory work which depended on the successful offering and sale of the Bonds. Each therefore had a motive to commit the fraud alleged herein, since they had an interest in preserving their relationships with Adelphia, its subsidiaries, and the Rigas family.

358.    Banc of America and Salomon were also motivated to commit fraud in connection with the sale of the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds, because the proceeds of those sales were to be used to repay borrowings by Adelphia's subsidiaries under credit facilities extended by, among others, Banc of America, Salomon, and their affiliates. By failing to disclose the Company's true financial condition, Banc of America and Salomon helped create a market for these Bonds.

359.    Salomon had the opportunity to commit fraud in connection with the sale of the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds, and Banc of America had the opportunity to commit fraud in connection with the sale of the 2010 Bonds and the 2011 Bonds, by virtue of their positions as lead underwriters, and their participation in the preparation of the Prospectuses and the amendments to the Registration Statement.

360.    As a result of their service as agents and/or lenders under the co-borrowing credit facilities between Adelphia's subsidiaries and certain Managed Entities, Salomon and Banc of America knew or recklessly disregarded the amount of borrowings under those agreements, and

118

that the Company's financial statements (which were incorporated by reference in the Prospectuses and the Registration Statement) did not fully disclose those borrowings and therefore materially understated the liabilities of the Company and its subsidiaries.

361.    As a result of their longstanding relationships with the Company and the nature of the underwriting and financial advisory services rendered to the Company, Salomon's and Banc of America's personnel were regularly present at the Company's corporate headquarters throughout this time period and had continual access to, and knowledge of, the Company's confidential corporate financial and business information through conversations with Company employees and review of the Company's non-public documents. Salomon and Banc of America therefore knew of or recklessly disregarded the adverse facts concerning the Company that led to the withdrawal of the Company's financial statements and rendered those statements materially misleading when issued.

362.    Salomon marketed and sold the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds, and Banc of America marketed and sold the 2010 Bonds and the 2011 Bonds, and recommended that investors purchase those Bonds, with knowledge of or in reckless disregard of the fact that the Company's Registration Statement and Prospectuses, and the public filings incorporated by reference therein, were materially false and misleading.

363.    Salomon's and Banc of America's scienter is further evidenced by the magnitude by which the Company's financial results were misstated in its financial statements: its revenues and EBITDA were overstated by approximately $500 million over two years, while its liabilities were understated by more than $3 billion. Absent intentional or reckless conduct, Salomon and

Banc of America would have detected these misstatements during the course of their due diligence and informed the investing public.

364.    Salomon and Banc of America each made the materially false and misleading statements alleged herein.  In particular, Salomon prepared the November 2009 Prospectus, the 2010 Prospectus, and the 2011 Prospectus, and Banc of America prepared the 2010 Prospectus and the 2011 Prospectus, and their names appeared on those documents.

365.    Salomon and Banc of America acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

366.    The materially false and misleading statements by Salomon, as alleged herein, were made in connection with the purchases of the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds by or on behalf of LACERA.

367.    The materially false and misleading statements by Banc of America, as alleged herein, were made in connection with the purchases of the 2010 Bonds and the 2011 Bonds by or on behalf of LACERA.

368.    LACERA and/or its agents relied on the Registration Statement (and amendments thereto) and the Prospectuses, including the financial statements that were incorporated by reference therein, as being accurate and complete when purchasing the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds.

369.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and they relied upon the representations made by the Defendants.

120

370.    These materially false and misleading statements proximately caused LACERA and/or its agents to purchase the November 2009 Bonds, the 2010 Bonds, and the 2011 Bonds, and thereby proximately caused LACERA to suffer damages.

371.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT X

**Violation of Section 18 of the Exchange Act, Against Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, Peter L. Venetis, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne**

372.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 and Count VI above as if fully set forth herein.

373.    This claim is brought pursuant to Section 18 of the Exchange Act, against Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, Peter L. Venetis, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne.

374.    As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Adelphia, including its Form 10-K filings for 1999 and 2000.

375.    In connection with the purchase of the Bonds, LACERA and/or its agents specifically read and relied upon the Company's SEC filings, including its Form 10-Ks for the years 1999 and 2000 and the financial statements contained therein.  Specifically, LACERA

and/or its agents read and relied on the Company's statements in those filings regarding its financial condition, including its revenue and debt levels. LACERA and/or its agents further relied on the Company's statements in those filings as being materially complete, and as not omitting material information, including information about the Company's financial condition and debts. LACERA and its agents relied on these SEC filings not knowing that they were false and misleading.

376.    The reliance by LACERA and its agents was reasonable, particularly given the unqualified audit opinions from Deloitte.

377.    The Company's Form 10-Ks for the years ended December 31, 1999 and 2000 were issued by Adelphia and signed by defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, Peter L. Venetis, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne.

378.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, LACERA was significantly damaged by the resulting drop in the value of the Bonds.

379.    As a direct and proximate result of Defendants' wrongful conduct, LACERA suffered damage in connection with its purchases of Bonds.

380.    By virtue of the foregoing, Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, Peter L. Venetis, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne have violated Section 18 of the Exchange Act.

## COUNT XI

**Violation of Section 18 of the Exchange Act,
Against John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael J. Rigas**

381.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 and Count VII above as if fully set forth herein.

382.    This claim is brought pursuant to Section 18 of the Exchange Act, against Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael J. Rigas.

383.    As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Arahova.

384.    In connection with the purchase of the 2003 Bonds and the January 2008 Bonds, LACERA and/or its agents specifically read and relied upon Arahova's SEC filings, including its Form 10-Ks for the year 2000 and the financial statements contained therein. Specifically, LACERA and/or its agents read and relied on Arahova's statements in those filings regarding its financial condition and debt levels. LACERA and/or its agents further relied on Arahova's statements in those filings as being materially complete, and as not omitting material information, including information about its financial condition and debts. LACERA and its agents relied on these SEC filings not knowing that they were false and misleading.

385.    The reliance by LACERA and its agents was reasonable, particularly given the unqualified audit opinion from Deloitte.

386.    Arahova's Form 10-K for the year ended December 31, 2000 was issued by Arahova and signed by defendants John Rigas, Timothy Rigas, Michael Rigas, and James Rigas.

387.    When the truth began to emerge about the false and misleading statements and omissions in Arahova's documents and reports filed with the SEC, LACERA was significantly damaged by the resulting drop in the value of the Bonds.

388.    As a direct and proximate result of Defendants' wrongful conduct, LACERA suffered damage in connection with its purchases of 2003 Bonds and January 2008 Bonds.

389.    By virtue of the foregoing, Defendants Arahova, John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael J. Rigas have violated Section 18 of the Exchange Act.

## COUNT XII

### Violation of Section 18 of the Exchange Act, Against Deloitte

390.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 and Count VIII above as if fully set forth herein.

391.    This claim is brought pursuant to Section 18 of the Exchange Act, against Deloitte.

392.    As set forth above, Deloitte made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC.  Specifically, Deloitte's audit opinions on Adelphia's annual financial statements for 1999 and 2000 were included in Adelphia's Form 10-K filing for those periods, and Deloitte's audit opinion on Arahova's annual financial statements for 2000 were included in Arahova's Form 10-K filing for that period.

393.    In connection with the purchase of the Bonds, LACERA and/or its agents specifically read and relied on the financial information contained in Adelphia's and/or

Arahova's Form 10-K filings, including Deloitte's audit opinions, not knowing that they were false and misleading.

394.    When the truth began to emerge about the false and misleading statements and omissions in Adelphia's and Arahova's documents and reports filed with the SEC, LACERA was significantly damaged by the resulting drop in the value of the Bonds.

395.    As a direct and proximate result of Deloitte's wrongful conduct, LACERA suffered damage in connection with its purchases of Bonds.

396.    By virtue of the foregoing, Deloitte has violated Section 18 of the Exchange Act.

## COUNT XIII

**Violation of Section 20(a) of The Exchange Act, Against James J. Rigas,
Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown,
Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne**

397.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 and Counts VI, VII and X above as if fully set forth herein.

398.    This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne.

399.    Adelphia committed a primary violation of Sections 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by making false and misleading statements of material fact, in connection with the purchase and sale of securities, which were relied upon by LACERA and/or its agents to LACERA's detriment (as described herein).  At the time these false and

misleading statements were made, the Company knew, or was reckless in not knowing, of their falsity.

400.    Defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne controlled Adelphia within the meaning of Section 20(a) of the Exchange Act.

401.    Defendants James Rigas, Timothy Rigas, James Rigas, Michael Rigas, and Peter Venetis were directors and senior executive officers of Adelphia.  Together, they held voting control of the Company and constituted a majority of Adelphia's Board of Directors.  Defendant Brown was a senior executive in Adelphia's finance department, who had authority to (and did) negotiate and execute co-borrowing agreements and other financial documents on the Company's behalf, and who was knowledgeable about the Company's debt levels and credit facilities. Defendants Coyle, Gelber, Metros, and Kailbourne were directors of Adelphia, and defendants Metros, Coyle and Kailbourne were members of the Audit Committee at various times.

402.    By virtue of their high level positions with the Company, their participation in and/or awareness of the Company's finances and operations, their participation on the Audit Committee, and/or their intimate knowledge of the false statements which were disseminated to LACERA and its agents, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the Registration Statement and Prospectuses (and/or the financial statements contained therein) and other SEC filings and public statements which LACERA contends are false and misleading.  These Defendants were provided with, or had unlimited access to, copies of the statements alleged by LACERA to be false and misleading

prior to and/or shortly after they were issued or publicly disseminated, and had the ability to prevent their issuance or public dissemination or cause the misstatements to be corrected, but negligently failed to do so.

403.    By virtue of their positions as controlling persons, defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne are liable pursuant to Section 20(a) of the Exchange Act.

404.    At all relevant times, Defendants James J. Rigas, Timothy J. Rigas, James P. Rigas, Michael R. Rigas, Peter L. Venetis, James R. Brown, Dennis P. Coyle, Leslie J. Gelber, Pete J. Metros, and Erland E. Kailbourne each had knowledge of or reasonable ground to believe that the Company's financial statements contained untrue statements of material fact and/or omitted material facts required to be stated therein to make them not misleading.

405.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and they relied upon the representations made by the Company.

406.    As a direct and proximate result of the wrongful conduct of these Defendants, LACERA suffered damages.

## COUNT XIV

### Professional Negligence, against Deloitte

407.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

408.    Deloitte is in the business of auditing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

409.    As the independent auditor of Adelphia, Deloitte had a duty to examine the financial statements of Adelphia and Arahova in accordance with GAAS to determine, among other things, whether they were presented in accordance with GAAP.  Deloitte owed LACERA a duty of reasonable care in connection with the provision of information concerning the financial condition of Adelphia and Arahova, including Deloitte's certifications that the companies' financial statements fairly and accurately reported their financial condition and were presented in accordance with GAAP.

410.    Deloitte breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in Adelphia's and Arahova's financial statements disseminated to LACERA, its agents, and the investing public.  Among other things, Deloitte falsely represented that it had audited the financial statements in accordance with GAAS and that those financial statements were presented in accordance with GAAP.

411.    Deloitte knew and intended that its reports concerning Adelphia's and Arahova's financial statements would be distributed to prospective purchasers of the Bonds and that such purchasers would rely, and had a right to rely, upon the information provided by Deloitte concerning the financial condition of Adelphia and Arahova in making their investment decisions.  Deloitte knew and intended that its certifications of Adelphia's and Arahova's annual

financial statements would be included and constituted a material part of those companies' annual reports on Form 10-K filed with the SEC.  Deloitte further knew and intended that its audit opinions and the annual financial statements of Adelphia to which they relate would be incorporated by reference in and constituted a material part of the Registration Statement and the Prospectuses, and Deloitte expressly consented to such incorporation.   Deloitte understood that a primary intent of Adelphia and Arahova was for Deloitte's professional services to benefit or influence prospective purchasers of the Bonds, including LACERA, since one of the primary purposes of having an accounting firm certify financial statements is to provide independent certification of the accuracy thereof to those who must rely on those financial statements when deciding whether to transact in the company's securities.

412.    At the very least, Deloitte knew and intended that the bondholders of Adelphia and Arahova at the time Deloitte's certifications were disseminated would rely thereon in deciding whether to sell or hold their Bonds, or whether to purchase additional Bonds.

413.    At the time of the misrepresentations and omissions of material facts by Deloitte, LACERA and its agents were ignorant of their falsity and believed them to be true.  LACERA and its agents relied upon the superior knowledge and expertise of Deloitte and justifiably relied (to LACERA's detriment) on the financial statements audited and certified by Deloitte, and on the unqualified opinions issued by Deloitte in connection with Adelphia's and Arahova's annual financial statements.  Had LACERA and/or its agents been aware of the true facts, they would not have purchased the Bonds.

414.    At the time the Bonds were purchased by or on behalf of LACERA, neither LACERA nor its agents knew of any of the false and/or misleading statements and omissions, and relied upon the representations made by the Defendants.

415.    Deloitte's conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.  As a direct and proximate result of the negligent misrepresentations (and omissions) by Deloitte, and in reliance thereon, LACERA suffered damages in connection with its purchases of the Bonds.

416.    LACERA did not discover that the Defendants had engaged in wrongful conduct, or that LACERA had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, prior to 2002.

## COUNT XV

### Common Law Fraud, against all Defendants

417.    LACERA repeats and realleges the allegations contained in paragraphs 1 through 247 above as if fully set forth herein.

418.    As alleged herein, Defendants made material misrepresentations, or omitted to disclose material facts, to LACERA, its agents, and the investing public regarding Adelphia's and Arahova's financial condition.

419.    The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by LACERA, its agents, and the investing public when making investment decisions.

420.    LACERA and/or its agents reasonably relied on Defendants' representations, and were ignorant of the material omitted facts, when they purchased the Bonds.

421.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

422.    As a direct and proximate result of the fraud and deceit of Defendants, LACERA suffered damages in connection with its purchases of the Bonds.

423.    LACERA did not discover that the Defendants had engaged in wrongful conduct, or that LACERA had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, prior to 2002.

## JURY DEMAND

424.    LACERA demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** LACERA prays for judgment as follows:

A.    Awarding compensatory damages in favor of LACERA against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.    Awarding rescission and/or rescissionary damages in favor of LACERA against all Defendants;

C.    Awarding prejudgment interest and/or opportunity cost damages to LACERA;

D.    Awarding LACERA the fees and expenses incurred in this action, including allowance of fees for LACERA's attorneys and experts; and

E.     Granting such other and further relief as the Court may deem just and proper.


DATED:  July 10, 2002                    By: _____
                                             Stuart M. Grant (PA Bar #73482)
                                             Jay W. Eisenhofer (PA. Bar #46584)
                                             Geoffrey C. Jarvis (PA. Bar #75473)
                                             Megan D. McIntyre
                                             GRANT & EISENHOFER, P.A.
                                             1220 N. Market Street, Suite 500
                                             Wilmington, DE 19801
                                             (302) 622-7000
                                             (302) 622-7100 (facsimile)

                                             Attorneys for Plaintiff Los Angeles County
                                             Employees Retirement Association

F:\MCINTYRE\Adelphia\Adelphia-complaint-LACERA2.wpd